UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:

DONALD JOSEPH ZELAZNY,

              Debtor.
_____/

STUART A. GOLD, TRUSTEE,

              Plaintiff,

vs.

MYLES DAVIS, and
DENTALKEEPING, LLC,
a/k/a INFINITY GROWTH SOLUTIONS,
a/k/a DENTAL SOFTWARE SOLUTIONS, LLC,

              Defendants.
_____/

Case No. 20-50976

Chapter 7

Judge Thomas J. Tucker

Adv. Pro. No. 21-4141

## POST-TRIAL OPINION

## I. Introduction

This adversary proceeding arose from the Chapter 7 bankruptcy of Donald Joseph Zelazny ("Zelazny" or "the Debtor"), a dentist. Pre-petition, in May 2017, Zelazny sold the assets of his dental practice, some of which were owned by Zelazny personally and some of which were owned by Zelazny's professional corporation, Donald J. Zelazny DDS, P.C. ("Zelazny PC"). The sale transaction generated $200,000.00 in sale proceeds, but $90,000.00 of those proceeds were transferred to Defendant Dentalkeeping, LLC ("Dentalkeeping"),[1] whose

---

[1] The Defendant Dentalkeeping, LLC is referred to in some of the documents in the record as DentalKeeping, LLC and in other documents as Dentalkeeping, LLC (without the capital "K"). The Court has used the latter designation, because that is how this Defendant's name appears in its Articles of Organization, which are in the record at Plaintiff's Exhibit 3 (Docket # 78-3).

sole and controlling member was Defendant Myles Davis. Myles Davis, in turn, received the full benefit of the $90,000.00 transfer.

The Plaintiff Chapter 7 Trustee filed this adversary proceeding against Myles Davis and Dentalkeeping, seeking to avoid and recover the $90,000.00 transfer as a fraudulent transfer, and also based on a breach of contract theory. After holding a bench trial, the Court now finds in favor of the Trustee, but only in part.

## II. Background and brief statement of the case

In June 2016, the Defendant Myles Davis formed Dentalkeeping,[2] and has been its sole member, and has controlled Dentalkeeping, at all relevant times. In August 2016, Myles Davis entered into a written agreement with the Debtor Zelazny and the Debtor's dental practice, Zelazny PC. Under that agreement, Myles Davis was to provide capital contributions and business support services to the Debtor's dental practice, through Dentalkeeping, with the expectation of expanding the Debtor's dental practice and sharing in the increased profits that would be generated as a result of the expansion. In return, the Debtor would continue to provide dental services to the patients of his dental practice.

Unfortunately, the August 2016 agreement did not result in the expansion of the Debtor's dental practice or any profits. After less than seven months of operating under the agreement, the Debtor and Myles Davis decided that it was best for the Debtor to sell his dental practice. The Debtor sold substantially all of the assets of the dental practice to another dentist for $200,000.00. Out of the $200,000.00 sale price, the Debtor and Zelazny PC received a total of $110,000.00, and Dentalkeeping received $90,000.00. Almost three and a half years after the

---

[2] *See* Pl.'s Ex. 3 (Dentalkeeping LLC Articles of Organization).

sale of his dental practice, the Debtor filed bankruptcy under Chapter 7.

The Trustee Stuart A. Gold, Chapter 7 Trustee in the Debtor's bankruptcy case, filed a three-count adversary complaint (the "Complaint") against Myles Davis and Dentalkeeping, seeking (1) avoidance, as a fraudulent transfer, and recovery of the $90,000.00 transfer to Dentalkeeping, under 11 U.S.C. §§ 544(b), and 550(a), and Mich. Comp. Laws. §§ 566.34(1)(a), 566.34(1)(b), and 566.35(1); (2) a money judgment against both Defendants, jointly and severally, in the amount of $90,000.00 for the Defendants' alleged breach of the August 2016 agreement; and (3) disallowance of any claim filed by the Defendants under 11 U.S.C. § 502(d) (Counts I, II, and III of the Trustee's Complaint).[3]

The Trustee alleges that the Defendants were insiders of the Debtor, and that on the date of the $90,000.00 transfer to Dentalkeeping, the Debtor was insolvent, or that the transfer rendered the Debtor insolvent, and that the Debtor received no consideration for the $90,000.00 transfer to Dentalkeeping. The Trustee alleges that neither the Debtor nor his dental practice had any obligation, under the August 2016 agreement or otherwise, to pay Dentalkeeping any of the sale proceeds. For these reasons, the Trustee alleges that allocating $90,000.00 of the sale proceeds to Dentalkeeping was both a fraudulent transfer, and a breach of the August 2016 agreement. The Trustee alleges further that the Defendants also breached the August 2016 agreement by failing to perform all of their obligations under it, including an obligation to make the Debtor a member of Dentalkeeping.

---

[3] Docket # 1.

3

The Court held a bench trial,[4] and now will decide this adversary proceeding.

The Court has considered all of the evidence and arguments presented by the parties. This includes the testimony of all the witnesses — namely, Defendant Myles Davis; the Debtor Donald Zelazny; attorney Mark Adams; and Greig Davis. And this includes all of the exhibits, or parts of exhibits, that were admitted into evidence.[5] This Opinion states the Court's findings of fact and conclusions of law.

### III. Summary of the outcome

For the reasons stated below, the Court finds in favor of the Trustee on Count I of the Complaint, but only to the extent of $70,000.00; the Court finds in favor of the Defendants on Count II of the Complaint; and the Court finds in favor of the Trustee on Count III of the Complaint. The Court will enter a judgment (1) in favor of the Trustee on Count I and against both Defendants, avoiding and recovering the transfer to Dentalkeeping, but only to the extent of $70,0000.00 of the $90,000.00 total transfer, plus pre-judgment and post-judgment interest; (2) in favor of the Defendants on Count II of the Complaint, dismissing that count with prejudice; and (3) in favor of the Trustee on Count III and against both Defendants, disallowing any claim filed or to be filed in Zelazny's bankruptcy case by either of the Defendants, under 11 U.S.C. § 502(d).

---

[4] Due to the COVID pandemic, the trial was conducted remotely, rather than in person in the courtroom. This was done by a combination of Webex video conference and telephone.

[5] In this Opinion, the Court will cite the trial exhibits using this format: "PX-__" for the Trustee's exhibits; and "DX-__," for the Defendants' exhibits. The Trustee's exhibits admitted into evidence are PX-1 through PX-17 except for the balance sheets for the Debtor's dental practice contained in PX-7. All of these Trustee's exhibits are filed at Docket # 78. The Defendants' exhibits admitted into evidence are DX-A through DX-E, DX-H, DX-J, DX-L through DX-N, DX-P, and DX-Q. These Defendants' exhibits are filed at Docket # 80.

## IV. Jurisdiction

This Court has subject matter jurisdiction over this adversary proceeding under 28 U.S.C. §§ 1334(b) (providing for jurisdiction "of all civil proceedings arising under title 11, or arising in or related to cases under title 11"), 157(a) and 157(b)(1), and Local Rule 83.50(a) (E.D. Mich.). The Trustee's claim for avoidance of a fraudulent transfer in Count I of the Complaint is a core proceeding under 28 U.S.C. § 157(b)(2)(H). The Trustee's claim for disallowance of any claims by the Defendants in Count III of the Complaint is a core proceedings under 28 U.S.C. § 157(b)(2)(B).

This proceeding also is "core," with respect to the Trustee's claims in Counts I and III of the Complaint, because each of these counts fall within the definition of a proceeding "arising under title 11" and of a proceeding "arising in" a case under title 11, within the meaning of 28 U.S.C. § 1334(b). Matters falling within either of these categories in § 1334(b) are deemed to be core proceedings. *See Allard v. Coenen* (*In re Trans-Industries, Inc.*), 419 B.R. 21, 27 (Bankr. E.D. Mich. 2009). With regard to each of these two counts, this is a proceeding "arising under title 11" because it is "created or determined by a statutory provision of title 11," *id.*, namely, 11 U.S.C. §§ 544 and 502(d). And these counts are proceedings "arising in" a case under title 11, because they are proceedings that "by their very nature, could arise only in bankruptcy cases." *Id.*

For these reasons, this Court has *statutory* authority, under 28 U.S.C. § 157(b)(1), to enter a final judgment on Counts I and III of the Trustee's claims. If and to the extent this Court might otherwise lack *constitutional* authority to enter a final judgment, under *Stern v. Marshall*, 564 U.S. 462 (2011), such a problem does not exist in this case. This is because all of the parties have expressly, knowingly, and voluntarily consented to this bankruptcy court entering a final

order or judgment, as permitted by 28 U.S.C. § 157(c)(2).[6] Given that consent, this bankruptcy court has both statutory and constitutional authority to enter a final judgment on the Trustee's claims in Count I and Count III of the Complaint. *See Ralph Roberts Realty, LLC v. Savoy (In re Ralph Roberts Realty)*, 562 B.R. 144, 147-48 (Bankr. E.D. Mich. 2016) (discussing, among other cases, *Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665 (2015) ); *Dery v. Karafa (In re Dearborn Bancorp, Inc.*), 583 B.R. 395, 400 (Bankr. E.D. Mich. 2018)).

The Court lacks "arising under" or "arising in" jurisdiction over the Trustee's breach of contract claim in Count II of the Complaint, because such claim is not created or determined by any provision of the Bankruptcy Code, and it is a claim that arises only under state law. But the Court concludes that it has "related to" jurisdiction over this claim, because the outcome of this adversary proceeding could conceivably impact the administration of the bankruptcy case. If the Trustee prevails on this claim and is awarded money damages, such damages would be property of the bankruptcy estate, which would be administered for the benefit of the estate. *See Mich. Emp. Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.),* 930 F.2d 1132, 1141 (6th Cir. 1991); *USA Promlite Tech., Inc. v. Am. First Nat'l Bank,* 636 B.R. 743, 752-53 (Bankr. S.D. Tex. 2022); *Loomis Elec., Inc. v. Lucerne Prods., Inc.*, 225 B.R. 381, 386 (N.D. Ohio 1998).

> Civil proceedings that fall only within . . . the bankruptcy court's . . . "related to" jurisdiction . . . are noncore. In a non-core proceeding, unless all parties consent, a bankruptcy court cannot enter final orders and judgments, but instead must "submit proposed findings of fact and conclusions of law to the district court," and the district court must enter the final order or judgment.

---

[6] *See* Final Pretrial Order (Docket # 75) at 1-2 ¶ 1.

$$28 \text{ U.S.C. §§ } 157(c)(1), 157(c)(2).[7]$$

*Allard v. Coenen*, 419 B.R. at 27-28. In this case, however, all the parties have consented to this Court's entry of a final judgment on all claims.[8] As a result, this Court also may enter a final judgment on the Trustee's breach of contract claim in Count II.

## V. Facts

The Debtor Zelazny is a licensed dentist and the sole shareholder and President of Zelazny PC. Zelazny incorporated Zelazny PC, a Michigan professional corporation, on January 1, 2014, as a subchapter S pass through entity. Until May 2017, Zelazny PC operated a dental practice in Franklin, Michigan.

### 1. The August 2016 agreement between Myles Davis, the Debtor, and the Debtor's dental practice

On August 22, 2016, the Defendant Myles Davis, Zelazny, and Zelazny PC entered into a written agreement, that was titled in this way:

---

[7] 28 U.S.C. § 157(c) states:

> (c)(1) A bankruptcy judge may hear a proceeding that is not a core proceeding but that is otherwise related to a case under title 11. In such proceeding, the bankruptcy judge shall submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing de novo those matters to which any party has timely and specifically objected.

> (2) Notwithstanding the provisions of paragraph (1) of this subsection, the district court, with the consent of all the parties to the proceeding, may refer a proceeding related to a case under title 11 to a bankruptcy judge to hear and determine and to enter appropriate orders and judgments, subject to review under section 158 of this title.

[8] *See* Final Pretrial Order (Docket # 75) at 1-2 ¶ 1; Report of the Parties' Rule 26(f) Conference (Docket # 15) at 3 ¶ 3(g).

Myles Davis
Donald J Zelazny DDS
Donald J Zelazny DDS PC
and
Dentalkeeping, LLC

Partnership and Business Support Services Agreement
Letter of Intent

August 22, 2016

(the "August 2016 Agreement").[9]  The August 2016 Agreement was signed by Myles Davis;

Zelazny, individually; and Zelazny, as President of Zelazny PC.

The terms of this agreement are central to the dispute in this case.  Among other things,

the August 2016 Agreement called for Myles Davis to make an initial capital contribution to

Dentalkeeping of up to 90,000.00, and for Dentalkeeping to use that capital contribution to "pay

down credit card debt of Zelazny and [Zelazny] PC and to fund marketing efforts."  The

Agreement stated:

> Whereby, Donald J Zelazny DDS (Zelazny) and Myles Davis
> (Davis) desire to enter into a partnership agreement to form a
> Business Support Organization called Dentalkeeping, LLC
> (Company), which shall be hired by Donald J Zelazny DDS, PC
> ([Zelazny] PC) to act as provider of business support services. This
> agreement shall act as an outline for a definitive agreement that
> shall be mutually agreed on by both parties.
>
> The Company shall provide nonprofessional business support
> services to Donald J Zelazny DDS, PC and all other dental offices
> owned in part or in its entirety by Donald J Zelazny DDS.
>
> **Donald J Zelazny shall receive a guaranteed payment of 50%
> of profits from the initial management services agreement
> which shall be between Company and [Zelazny] PC.
> Thereafter Zelazny shall be entitled to 33% profits of future**

---

[9]  PX-2 is a copy of the August 2016 Agreement.

8

**management agreement services and Davis shall be entitled to 67% of profits.**

**Davis shall initially fund Company with up to $90,000. Zelazny shall not be required to make any capital contributions. The initial contribution shall be used to pay down credit card debt of Zelazny and [Zelazny] PC and to fund marketing efforts.**

**All capital contribution[s] required shall be the responsibility of Davis. In every case capital contributed shall be repaid prior to guaranteed payments or distributions of any kind (except doctor compensation).** Capital calls shall be made at the sole discretion of Davis.

It is the intention of Company to manage offices owned by Zelazny. Company, with the input of Zelazny, shall establish best practices for management of the Company. Company shall present a formal business plan for [Zelazny] PC as well as future practice acquisitions. Company and [Zelazny] PC desire to operate and manage ten dental practices within 5 years. From time to time Company, [Zelazny] PC, Davis and Zelazny may be required to seek bank financing. All parties shall act with best efforts to secure needed financing.

Services to be provide[d] by each party:

Davis shall be responsible for the following service:

- Maintain budgets and business plans
- Day to day management of back office duties
- Monitoring performance
- Bookkeeping and accounting
- Act as CEO and CFO of the [C]ompany
- Capital markets and financing
- Facility management
- CE coordinator
- Human resources
- Marketing
- Scheduling and recall
- Purchasing

Zelazny shall be responsible for the following services:

9

- Clinical oversite and evaluation
- Dental quality control
- Product evaluation
- Employee clinical training

All expenses of the practice shall be paid out of Company including employee payroll. Zelazny shall run all clinical aspect[s] of any and all practices managed and shall be providing patient care for the initial practice. **All collections of the practice shall be deposited into Company account. Zelazny shall receive a payment for dental services and providing dental care prior to payment of any other Company expenses or debt service equal to 35% of his collected production.**

Upon death or disability of Zelazny, or sale of managed practices, Zelazny, [Zelazny] PC and Company shall be bound by this service agreement.

It is hereby acknowledged that Davis has obligation[s] and responsibilities to Doeren Mayhew as an employee and New State Capital or their related parties. Any work or service performed or in relation to these parties are expressly excluded from this agreement. It is further acknowledged that Davis and related parties provide accounting, tax and consulting services for Zelazny and [Zelazny] PC, and there is an inherent conflict of interest, and both Zelazny and [Zelazny] PC hereby acknowledge they shall seek outside legal advice with respect to this agreement.

This agreement shall be transferable by Company to a third party.[10]

## 2. Background of the August 2016 Agreement

As Zelazny testified, at the time he entered into the August 2016 Agreement, he did not know that Myles Davis had already filed articles of organization for Dentalkeeping, on June 21, 2016.[11]

---

[10]  PX-2 at 1-2 (emphasis added).

[11]  *See* Tr. of Day 2 of Trial (Docket # 98) (testimony of Zelazny) at 11.  PX-3 is a copy of the Articles of Organization for Dentalkeeping.

10

Myles Davis never made Zelazny a member of Dentalkeeping. Myles Davis has always been the sole member of Dentalkeeping,[12] and has always controlled Dentalkeeping.

Greig Davis "helped [draft], if not completely, draft[]" the August 2016 Agreement.[13] Greig Davis is the father of Myles Davis, and a CPA, who had been preparing the tax returns for both Zelazny and Zelazny PC for about five years.[14] Greig Davis had a CPA firm focusing on dental groups for more than 25 years. He "had approximately 250, 300 dental clients in 2015, when [he] sold [his] firm to Doeren Mayhew, a larger national firm" and joined that firm as a partner.[15] Greig Davis has a bachelor's degree in accounting and a master's degree in taxation and is a certified valuation analyst.[16]

Greig Davis testified that the August 2016 Agreement resulted from a conversation he had with Zelazny in June or July of 2016, in which Zelazny advised him that he was going to file bankruptcy. During that conversation, Greig Davis advised against filing bankruptcy, and told Zelazny that Zelazny should instead work with Myles Davis, who could "help him manage his practice, and then hopefully get it turned around and then [they would] look at future opportunities to buy practices and avoid bankruptcy."[17] Greig Davis testified that the parties intended the August 2016 Agreement to be "a kind of guideline for what . . . Myles [Davis]

---

[12] *See* PX-9 (Aff. of Myles Davis) at 2 ¶¶ 6-7.

[13] Tr. of Day 3 of Trial (Docket # 99) (testimony of Greig Davis) at 11.

[14] *Id.* at 5, 11, 15; *see also* Tr. of Day 1 of Trial (Docket # 97) (testimony of Myles Davis) at 16.

[15] *See* Tr. of Day 3 of Trial (Docket # 99) (testimony of Greig Davis) at 5, 11, 15.

[16] *Id.*

[17] *Id.* at 12-13.

11

would in this [C]ompany . . . do going forward."[18]  Greig Davis testified further that "the intention was to try with [Zelazny's] practice, see how things went, and then really reach out to attorneys and then have a August 2016 agreement with all the clauses and terms spelled out."[19]

Greig Davis does not recall any point in time when he met with Zelazny to discuss the drafting of the August 2016 Agreement.[20]  Greig Davis loaned to his son Myles Davis $90,000.00 so that Myles Davis could make the capital contributions to Dentalkeeping called for by the August 2016 Agreement.[21]

### 3.  Events after the execution of the August 2016 Agreement

According to Zelazny, after the parties entered into the August 2016 Agreement, there were no further negotiations between the parties to that agreement, and the parties never entered into any other written or oral agreement.[22]  After executing the August 2016 Agreement, each of the parties immediately began performing services required under that agreement.  Myles Davis acted as CEO and CFO of Dentalkeeping;[23] deposited money into Dentalkeeping's checking account to pay credit card debt and expenses of Zelazny and Zelazny PC; and performed bookkeeping and accounting services for Zelazny PC,[24] while Zelazny performed dental services.

---

[18]  *Id.* at 16.

[19]  *Id.*

[20]  *Id.* at 19, 27.

[21]  *Id.* at 50.

[22]  *See infra* note 25.

[23]  Tr. of Day 1 of Trial (Docket # 97) (testimony of Myles Davis) at 99.

[24]  Tr. of Day 1 of Trial (Docket # 97) (testimony of Myles Davis) at 125.

12

Because the parties were operating under the terms of the August 2016 Agreement, and because there were no further negotiations, and because there were no other written agreement documents ever presented to him, Zelazny believed that the August 2016 Agreement was the parties' final agreement.[25]

Zelazny testified that he knows that Myles Davis made capital contributions to Dentalkeeping to pay credit card debt of Zelazny and Zelazny PC, but he does not know the amount of those capital contributions, because Myles Davis handled all of the finances of Zelazny PC.[26] The evidence shows, and Myles Davis admits, that Myles Davis made a total of $90,000.00 in "capital contributions" to Dentalkeeping during the time period of August 22, 2016 through October 23, 2016.[27] But there is a dispute about how much of those capital

---

[25] At trial, Zelazny testified that he believed that the August 2016 Agreement was the final agreement between the parties:

> Q. Now, the last sentence in that paragraph [of the August 2016 Agreement] says, "This agreement shall act as an outline for a definitive agreement that shall be mutually agreed on by both parties."
>
> So when you signed this agreement and read that sentence, you understood that this was not a final document, that it was an outline for a future definitive agreement that would eventually be signed by you and Myles Davis and your dental practice and Dental[k]eeping, correct?
>
> A. That's what I would have expected, but that never . . . materialized, either in a meeting or in paper. I never received any additional documentation about that, so this, to me, was the final document because it was the only one ever discussed or given to me.

Tr. of Day 2 of Trial (Docket # 98) (testimony of Zelazny) at 11-12; *see also* Tr. of Day 1 of Trial (Docket # 97) (testimony of Zelazny) at 144-45.

[26] Tr. of Day 2 of Trial (Docket # 98) (testimony of Zelazny) at 18-22.

[27] *See* Tr. of Day 1 of Trial (Docket # 97) (testimony of Myles Davis) at 36-38 (discussing deposits shown on PX-10). This evidence shows that Myles Davis made capital contributions to Dentalkeeping in the following amounts, on the following dates: (1) $50,000.00 on August 22, 2016; (2)

13

contributions to Dentalkeeping that Myles Davis then caused Dentalkeeping to pay for the benefit

of Zelazny PC and Zelazny, as contemplated by the August 2016 Agreement. Myles Davis

alleges that the amount paid by Dentalkeeping for the benefit of Zelazny and Zelazny PC totaled

$90,154.96.[28] The Trustee argues that the amount totaled only $40,197.63.[29] And Myles Davis

admits that the $40,197.63 total amount was paid for the benefit of Zelazny PC by Dentalkeeping

"within three days" after Myles Davis signed the August 2016 Agreement.[30]

### 4. Myles Davis's allegation that the August 2016 Agreement was later orally modified

Myles Davis denies that the August 2016 Agreement was the parties' final agreement.[31]

Myles Davis testified that sometime after entering into the August 2016 Agreement, the parties to

that agreement entered into an *oral* modification of it.[32] (Myles Davis admits that there were no

---

$25,000.00 on September 7, 2016; (3) $10,000.00 on October 17, 2016; (4) $5,000.00 on October 23, 2016. Myles Davis admitted that this total of $90,000.00 was "the capital contribution [he] committed to make to DentalKeeping under the August 2016 Agreement." (*Id.* at 37-38).

[28] *See* PX-9 (Aff. of Myles Davis) at 3 ¶ 13; *see also* Tr. of Day 3 of Trial (Docket # 99) (testimony of Myles Davis) at 68-70. As proof of his contribution amount, Myles Davis relies on a document entitled "Infinity Growth Solutions General Ledger Report For (01/01/2016 to 05/31/2021)" (*see* DX-D at pdf p. 1). Infinity Growth Solutions is a "doing business as" name for Dentalkeeping.

[29] Compl. (Docket # 1) at 4 ¶ 15. Myles Davis admits that he "never produced copies of canceled checks or paid bills or invoices to substantiate the alleged investment of [$]90,000 beyond the [$]40,197.63 that [he] substantiated." *See* Tr. of Day 1 of Trial (Docket # 97) (testimony of Myles Davis) at 64. All monies over $40,197.63 that Myles Davis is counting as part of his investment under the August 2016 Agreement were "counter checks" that Myles Davis has not produced. *Id.*

[30] *See id.* at 46.

[31] *See* PX-9 (Aff. of Myles Davis) at 2 ¶ 9 ("The [August 2016 Agreement] does not represent the actual terms of Dentalkeeping's final agreement with [Zelazny] and Zelazny PC.").

[32] *Id.* at 2 ¶ 10 ("Shortly after signing the Letter of Intent, the deal was modified through oral modifications.").

14

signed written agreements modifying the August 2016 Agreement).[33]  According to Myles Davis,

under the August 2016 Agreement, as orally modified: (1) Myles Davis was no longer a party to

that agreement;[34] (2) Dentalkeeping became a party to that agreement;[35] (3) the $90,000 was to be

paid to and for the benefit of Zelazny PC by Dentalkeeping, and was an interest-free unsecured

*loan*, which was to be repaid in six months, rather than "capital contributions;"[36] and (4) neither

Zelazny, nor Zelazny PC were to become members of Dentalkeeping.[37]  According to Myles

Davis, under the oral modification of the August 2016 Agreement, there was no change in the

business support services Myles Davis was to perform under that agreement.[38]  And there were

---

[33]  Tr. of Day 1 of Trial (Docket # 97) (testimony of Myles Davis) at 68.

[34]  *Id.* at 2 ¶ 11 ("The final agreement that resulted was between Dentalkeeping, [Zelazny] and Zelazny PC.").

[35]  *Id.*

[36]  *Id.* at 2  ¶¶ 12 ("Under the final agreement, Dentalkeeping would loan $90,000 to Zelazny PC to pay off some of Zelazny PC's existing accounts payable."), 17 ("Dentalkeeping's $90,000 loan was to be repaid by Zelazny PC within six (6) months without interest which was based on my experience and agreement with the Debtor on the time frame it would take to assist Zelazny, PC [to] turnaround its business operations."); *see also* Tr. of Day 1 of Trial (Docket # 97) (testimony of Myles Davis) at 70 (agreeing that he is "alleging that Dental[k]eeping . . . made a $90,000 loan to Zelazny, P.C"), 85 (agreeing that he is alleging that a modification of the August 2016 Agreement was that the $90,000 investment was a loan); Tr. of Day 3 of Trial (Docket # 99) at 55 (testimony of Greig Davis) (agreeing the alleged $90,000 loan was unsecured).  The Affidavit that Myles Davis filed on January 13, 2022, was the first time during the course of this bankruptcy case, which was filed on October 26, 2020, that Myles Davis alleged that the August 2016 Agreement had been orally modified "to provide that the $90,000 of alleged expenditures was really a loan and not an investment[.]"  Tr. of Day 1 of Trial (Docket # 97) (testimony of Myles Davis) at 86.

[37]  PX-9 (Aff. of Myles Davis) at 3 ¶ 17 ("Also as part of the final agreement, neither [Zelazny] nor Zelazny PC, were to obtain any membership interest in Dentalkeeping, and I would remain the sole member."); *see also* Tr. of Day 1 of Trial (Docket # 97) (testimony of Myles Davis) (agreeing that a modification of the August 2016 Agreement was that "Zelazny would no longer be a member of Dental[k]eeping").

[38]  PX-9 (Aff. of Myles Davis) at 2 ¶ 15 (Also as part of the final agreement, Dentalkeeping would provide the services outlined in the [August 2016 Agreement].");  *see also* Tr. of Day 1 of Trial (Docket # 97) (testimony of Myles Davis) at 75.

15

no changes in the other terms of that agreement, including the provision entitling Myles Davis to a substantial share of the profits of Zelazny PC, if Zelazny PC expanded and generated profits.[39] Under the August 2016 Agreement, even as allegedly orally modified, "[i]f the practice had grown into new locations[, Myles Davis's] share of the profits would have increased from 50 percent to 67 percent on any new future management agreements[.]"[40] And even as the August 2016 Agreement was allegedly orally modified, "Dental[k]eeping was not required to be paid for the business support services unless there were profits generated for Dental[k]eeping[.]"[41]

At trial, Myles Davis was unable to recall when the alleged oral modification of the August 2016 Agreement occurred.[42] There are no documents evidencing loans from Dentalkeeping to Zelazny or Zelazny PC. Dentalkeeping has no promissory notes or guarantees signed by Zelazny or Zelazny PC.[43] And there are no loans from Dentalkeeping listed on Zelazny

---

[39] *See* Tr. of Day 1 of Trial (Docket # 97) (testimony of Myles Davis) at 70 (agreeing that "[i]f Zelazny, P.C. had operated profitably, then Dental[k]eeping would have been entitled to profits under the August 2016 [A]greement" and that term in the August 2016 "never changed").

[40] *Id.* at 72.

[41] *Id.* at 70-71.

[42] When Myles Davis was asked if it was in March 2017, when Zelazny fell behind in paying the rent for the building in which his dental practice was located, that Myles Davis alleges there was an oral modification in the August 2016 Agreement, Myles Davis responded: "I don't recall." (PX-17 (Dep. Tr. of Myles Davis) at 72, 76.) And when asked if the August 2016 Agreement was modified in April 2017, Myles responded "I don't recall." (*See id.* at 84.) *See also* Tr. of Day 1 of Trial (Docket # 97) (testimony of Myles Davis) at 97-98.

[43] Tr. of Day 1 of Trial (Docket # 97) (testimony of Myles Davis) at 68-70:

> Q. There are no promissory notes between Dental[k]eeping and the [D]ebtor concerning the $90,000 investment or loan, correct?
>
> A. That is . . . correct.
>
> Q. There's no promissory note between Dental[k]eeping and

16

PC's 2016 federal income tax return Form 1120S, "U.S. Income Tax Return for an S

Corporation."  The only loan listed on that tax return is a shareholder loan from Zelazny to

---

Zelazny, P.C., correct?

A.  That is correct.

Q.  There's no promissory note between you and the [D]ebtor for the alleged $90,000 loan, correct?

A.  That is correct.

Q.  There's no promissory note between you and Zelazny, P.C. regarding the alleged $90,000 loan, correct?

A.  That's correct. . . . .
. . . .

Q.  . . . [I]isn't it true there's no written guarantee agreement between you and the [D]ebtor for the [D]ebtor to repay that alleged loan?

A.  That's correct.

Q.  . . . And isn't it true there's no written guarantee agreement between you and Zelazny, P.C. for Zelazny, P.C. to repay you any alleged $90,000 loan?

A.  That's correct. Not a formal agreement.

Q.  Okay. There's no written guarantee, personal guarantee, between Dental[k]eeping and the [D]ebtor where the [D]ebtor would guarantee the repayment of Dental[k]eeping's loan to Zelazny, P.C., true?

A.  That is true.

Q.  And there's no written guarantee agreement between the [D]ebtor and Dental[k]eeping, LLC for the [D]ebtor to repay the alleged $90,000 loan from Dental[k]eeping to Zelazny, P.C., true?

A.  That is true.

*See also* Tr. of Day 3 of Trial (Docket # 99) (testimony of Greig Davis) at 55-57 (same).

Zelazny P.C.[44]  This tax return was prepared by Greig Davis with information provided to him by Myles Davis, acting as CFO, CEO, and bookkeeper of Zelazny PC.[45]

### 5. The May 1, 2017 sale of substantially all of the assets of the Debtor's dental practice and of the assets of the Debtor related to the dental practice

Unfortunately "[t]here ended up being no profits to split" and "[Myles Davis], Dental[k]eeping, and [Zelazny] were unable to grow Zelazny, P.C.'s practice into more practices."[46]  In December 2016, Zelazny PC fell behind on the rent for the leased property out of which the dental practice had been operating, and in January 2017, both Zelazny and Myles Davis were communicating with the landlord, David A. Wright ("Wright"), regarding the unpaid rent.[47]  In emails to Wright, Myles Davis was trying to "buy some time to pay rent."[48]  Myles Davis considered the payment of rent to be "a lower priority bill" and he focused on paying the bills he needed to pay to keep the dental practice running.[49]  Myles Davis's "first and foremost" concern in paying bills was "to keep the lights on for [Zelazny]."[50]

In March 2017, because Zelazny PC was having financial difficulties, Myles Davis, Greig

---

[44]  *See* PX-12 at pdf p. 4 Item 19 (showing $248,430.00 in "Loans from Shareholders"), Item 16 (showing only current accounts payable), pdf p. 11 ("Other Current Liabillities") (listing only a "401K PAYABLE" in the amount of $2,135; "CREDIT CARDS PAYABLE" in the amount of $61,867; and "SIMPLE PAYABLE" in the amount of $0, for a total of $64,002.

[45]  Tr. of Day 1 of Trial (Docket # 97) (testimony of Myles Davis) at 98-99; *id.* (testimony of Zelazny) at 151.

[46]  *Id.* at 71.

[47]  *Id.* at 75-76; *see also* PX-7 at pdf pp. 71-73.

[48]  Tr. of Day 1 of Trial (Docket # 97) (testimony of Myles Davis) at 77.

[49]  *Id.* at 78.

[50]  *Id.*

18

Davis, and Zelazny discussed the possibility of abandoning the August 2016 Agreement; not putting any more capital into Zelazny PC; transferring all of the books and records of Zelazny PC back to Zelazny PC and Zelazny; and Zelazny filing bankruptcy.[51]

On March 5, 2017, rather than taking the actions just described and filing bankruptcy, the Debtor Zelazny decided to sell his assets related to his dental practice, and Zelazny PC's assets.[52] Greig Davis found a buyer, Tiffany Danyal, D.D.S.[53] Tiffany Danyal, D.D.S. was either in the process of becoming a client of Doren Mayhew or was already a new client of that firm, and was looking for a dental practice to buy, and was in the process of purchasing multiple practices.[54] Greig Davis referred Zelazny to Mark Adams, the attorney who drafted the purchase agreement between Zelazny, Zelazny PC, and Tiffany Danyal, D.D.S.[55] Mark Adams had a professional relationship with Greig Davis for about 5 years before the purchase agreement was drafted. Mark Adams estimates that Greig Davis would make about three or four referrals to him per year, and that he handled about five or six sales of dental practices for Greig Davis before May 1, 2017.[56] Myles Davis also made referrals to Mark Adams. Mark Adams estimates that from January 2016 through the present, Myles Davis made less than 10 referrals to him.[57]

---

[51] *See* PX-17 (Dep. Tr. of Myles Davis) at 73-76.

[52] Tr. of Day 1 of Trial (Docket # 97) (testimony of Myles Davis) at 72.

[53] *Id.* at 122; *see also* Tr. of Day 3 of Trial (Docket # 99) (testimony of Greig Davis) at 27.

[54] Tr. of Day 3 of Trial (Docket # 99) (testimony of Greig Davis) at 27-28.

[55] *Id.* at 24.

[56] Tr. of Day 2 of Trial (Docket # 98) (testimony of Mark Adams) at 113.

[57] *Id*. at 113-14.

On April 12, 2017, Greig Davis emailed to Mark Adams, with a copy to Zelazny and to Tiffany Danyal, D.D.S., about the terms to include in the purchase agreement,[58] and how to allocate the purchase price among the various assets that were being sold to the buyer, Tifanny Danyal, D.D.S. (the "April 12, 2017 Email").[59] Greig Davis testified at trial that he sent the April 12, 2017 Email after discussions with Zelazny, Tiffany Danyal, Myles Davis, and Pam Wilson, the niece of Zelazny.[60]

---

[58] *See* PX-13 (email dated April 12, 2017 at 7:58 a.m. from Greig Davis to Mark Adams with a copy to Zelazny and Tiffany Danyal, D.D.S., the buyer of assets of Zelazny and assets of Zelazny PC). The email stated:

> Mark
> Can you put together a purchase agreement for the sale of Donald J Zelazny DDS PC and Dr. Donald J Zelazny (Sellers) and Tiffany Danyal or entity to be created (Buyer)
> Selling price 200,000 - $20,000 down with a note to Dr Donald Zelazny for $90,000, 30 months at 3.5% interest and the assumption of Liabilities to Dental[k]eeping LLC for $90,000 by way of a note at 3.5% interest which is added to principle for 30 months with payments starting month 31 and payable over 30 months. Sale includes all asset and assumption of premise lease. But does not include the sale of AR which will be collected by Seller.
>
> Effective date 5/1 (if possible). Allocation of purchase price $50,000 equipment, $10,000 covenant not to compete 7 miles and 2 years the remainder goodwill. Dr Danyal will sign personally on both notes and secured by the practice.
>
> Let me know if you need anything else. Feel free to reach out to Dr. Zelazny or Dr Danyal for addition[al] info i[f] need be. They are copied on this email. I believe Dr. Danyal has already worked on a new lease. Tiffany please let us know what the status of the lease is.
>
> If I missed anything please let me know.

The April 12, 2017 Email is also one of the Defendant's exhibits – DX-P.

[59] Tr. of Day 3 of Trial (Docket # 99) (testimony of Greig Davis) at 26.

[60] *Id.* at 30.

After being referred to Mark Adams by Greig Davis, according to Greig Davis, Zelazny PC signed an engagement letter with Mark Adams, agreeing to pay him for his services with regard to an asset sale to Tiffany Danyal, D.D.S.[61]  Mark Adams billed Zelazny PC $2,500.00 for his work related to the sale.[62]  But Zelazny did not consider Mark Adams to be representing either him or Zelazny PC in the sale transaction.  Zelazny testified that he did not know Mark Adams at all, did not participate in the decision to select him as counsel, and to the best of his memory, the first time he ever met Mark Adams was at the closing of the asset sale.[63]

On May 1, 2017, Zelazny PC, Zelazny, and Tiffany Danyal, D.D.S. entered into an agreement entitled "Dental Practice Purchase Agreement" (the "May 1, 2017 Sale Agreement" or the "Sale Agreement").[64]  Some of the terms of the May 1, 2017 Sale Agreement were different from the terms in Greig Davis's April 12, 2017 Email.  Under the Sale Agreement, Tiffany Danyal, D.D.S. agreed to buy, and Zelazny and Zelazny PC agreed to sell, certain assets of Zelazny and certain assets of Zelazny PC, used in Zelazny's dental practice.  It stated, in relevant part:

> **WHEREAS**, the Sellers [(Zelazny and Zelazny PC)] desire to sell to the Buyer [(Tiffany Danyal, D.D.S., an individual)] and the Buyer desires to purchase from the Sellers certain of the assets owned by the Corporate Seller [(Zelazny PC)] and used in the Corporate Seller's Dental Practice as well as the personal goodwill of the Individual Seller [(Zelazny)] on the terms and conditions

---

[61]  *Id.* at 116.  There is no copy of such an engagement letter in the record.

[62]  *See* DX-Q (Invoice dated May 8, 2017 from Mark Adams to Zelazny PC for work performed related to the sale of Zelazny's assets and the assets of Zelazny PC).

[63]  Tr. of Day 1 of Trial (testimony of Zelazny) at 154.

[64]  *See* PX-14.

contained in this [Sale] Agreement.[65]

Tiffany Danyal, D.D.S. agreed to buy the assets listed in the Sale Agreement for $200,000 (the "Sale Price"). In Section 3 of the Sale Agreement, the Sale Price was allocated as follows:

| | |
|---|---|
| Equipment, fixtures, furniture and Supplies as listed on Exhibit 1a | $ 50,000.00 |
| **Sellers' Goodwill** | **$140,000.00** |
| **Covenant Not to Compete** | **$10,000.00** |
| Total | $200,000.00[66] |

The Sale Agreement stated that the "Buyer and Sellers shall each complete IRS form 8594 in accordance with the allocations set forth in this Section 3."[67] Greig Davis testified that it is likely that he suggested how the purchase price would be allocated among the assets being sold.[68]

Section 4.a of the May 1, 2017 Sale Agreement detailed how the Sale Price would be paid:

> **4. PAYMENT OF SALE PRICE**
> a. Thirty Thousand and 00/100 Dollars ($30,000.00) of the total Sales Price (the "Initial Payment") shall be paid in full at closing less any deposit previously paid by Buyer ($0). On the Closing Date and as an absolute condition precedent to the closing, Buyer shall enter into (1) a secured promissory note with the Individual Seller [(Zelazny)] for Eighty Thousand and 00/100 Dollars ($80,000.00) of the total Sales Price at terms mutually agreeable to the parties; and (2) a secured promissory note with Dental[k]eeping LLC for Ninety Thousand and 00/100 Dollars ($90,000.00) of the total Sales Price at terms mutually agreeable to the Buyer and

---

[65] *Id.* at 1.

[66] *Id.* at 3 ¶ 3.a (bold added).

[67] *Id.* at 3 ¶ 3.b.

[68] Tr. of Day 3 of Trial (Docket # 99) (testimony of Greig Davis) at 34-35.

Dental[k]eeping LLC.[69]

Under paragraph 6 of the Sale Agreement, Tiffany Danyal, D.D.S. did not assume any liabilities of either Zelazny or Zelazny PC.[70]

### 6. Events after the closing of the May 1, 2017 Sale Agreement

After the May 1, 2017 Sale Agreement was executed, neither Myles Davis nor Dentalkeeping performed any accounting or other services for Zelazny or Zelzny PC.[71]  The initial $30,000.00 downpayment under the Sale Agreement was deposited into the bank account for Zelazny PC and was used for paying bills, but there was not enough in that account to pay all of the creditors of Zelazny PC.  There were a number of credit card companies and dental supply companies that Zelazny PC was unable to pay, and no money was paid to Zelazny on the $248,430 shareholder loan he had made to Zelazny PC.[72]

Creditors of the Debtor Zelazny who remained unpaid after the closing of the May 1, 2017 Sale Agreement, and who have filed claims in Zelazny's bankruptcy case, include the following:[73]

| Claim No. | Creditor | Date Claim Arose | Amount |
|-----------|----------|------------------|--------|

---

[69]  PX-14 at 3 ¶ 4.a.

[70]  *Id.* at 4 ¶ 6; *see also* Tr. of Day 2 of Trial (Docket # 98) (testimony of Mark Adams) at 125 (His (Mark Adams's) intent in drafting paragraph 6 of the May 1, 2017 Sale Agreement "was to indicate that the [B]uyer was not assuming any liabilities of the [Zelazny PC] nor . . . Zelazny.").

[71]  *See* PX-17 (Dep. Tr. of Myles Davis) at 88-91.

[72]  Tr. of Day 1 of Trial (Docket # 97) (testimony of Zelazny) at 159.

[73]  This list of claims is taken from PX-16, which is derived from the Court's claims registry for Case No. 20-50976, supplemented by a review of the proofs of claim filed.

23

| 1 | Bank of America | April 1, 2016 | $28,341.78 |
|---|---|---|---|
| 2 | Internal Revenue Service | 2017 | $29,897.60, ($15,086.00 of which is for 2017)[74] |
| 3 | American Express National Bank | May 31, 2016 | $    164.23 |
| 4 | U.S. Bank National Association | December 24, 2013 | $ 1,995.01 |
| 5 | U.S. Bank National Association | March 1, 1994 | $27,343.92 |
| 6 | Verizon | April 1, 2004 | $     57.39 |
| 7 | Michigan Unemployment Agency | 2nd Quarter 2017 | $    102.59 |
| 8 | Michelle Ann Zelazny[75] | August 12, 2014 | $43,969.90 |

These debts alone total $117,060.83 (using the $15,086.00 debt amount for the Internal Revenue Service claim). (The total amount of debts listed in Zelazny's Schedules D and E/F filed in his bankruptcy case is $244,007.64).[76]

The amount of Zelazny's debts substantially exceeded the value of Zelazny's assets at the time of and immediately after the closing of the May 1, 2017 Sale Agreement.[77] This is shown

---

[74] *See* Proof of Claim No. 2-1, filed in Case No. 20-50976 by the Internal Revenue Service, at pdf p. 4. The $15,086.00 debt for 2017 reflects tax liability incurred because of the May 1, 2017 Sale Agreement transaction, and that amount does not include interest or penalties. *See id.*; Tr. of Day 1 of Trial (Docket # 97) (testimony of Zelazny) at 167, 172.

[75] Michelle Ann Zelazny is Zelazny's ex-wife and the amounts owed are for spousal support and child support. *See* PX-15 (Judgment of Divorce between Michelle Ann Zelazny and Zelazny entered on August 8, 2014).

[76] *See* PX-1, at Schedules D, E/F.

[77] *See, e.g.*, Tr. of Day 1 of Trial (Docket # 97) (testimony of Zelazny) at 178 (as of May 1, 2017, "[t]he value of my assets was substantially less than the value of my liabilities at that time.")

by the detailed testimony of the Debtor Zelazny and the documentation presented by the Trustee.[78]  At that time, Zelazny's assets included the $80,000.00 promissory note from the sale, the shareholder loan owing from Zelzany PC to Zelazny, which was worthless after Zelzany PC sold all of its assets; and very few other assets — including a little money in a checking account, a Jeep in which he had no equity, since he owed almost all of the loan payments on it, some furniture, a laptop computer, and a couple of guitars.[79]  And Zelazny credibly testified that after the closing of the Sale Agreement, he was not able to pay all of his debts to his creditors as they came due.[80]

Dentalkeeping, Zelazny, and Zelazny PC received all money owed to each of them under the May 1, 2017 Sale Agreement.[81]  Zelazny and Zelazny PC received a total of $110,000.00 and Dentalkeeping received $90,000.00.  Myles Davis used his control over Dentalkeeping to obtain the $90,000.00 from Dentalkeeping, and he used it for his own personal purposes, including using some of it to make car payments and some of it to repay loans he had received from his father.[82]

Zelazny testified that although, in signing the May 1, 2017 Sale Agreement, he agreed

---

[78]  *See* Tr. of Day 1 of Trial (Docket # 97) (testimony of Zelazny) at 159-78.

[79]  *Id.* at 159-60.

[80]  *Id.* at 171.

[81]  Tr. of Day 2 of Trial (Docket # 98) (testimony of Zelazny) at 37 (testimony regarding the payment to Zelazny PC of $30,000.00 at closing of the May 1, 2017 Sale Agreement), 40 (testimony that he has been paid in full the $80,000 in monthly installment payments); Tr. of Day 1 of Trial (testimony of Myles Davis) at 117-18 (agreeing that "Dentalkeeping . . . received all of the payments on the promissory note it received from [Tiffany Danyal.]").

[82]  Tr. of Day 1 of Trial (testimony of Myles Davis) at 124-25.

25

that Dentalkeeping would receive $90,000.00 of the sale proceeds, he now thinks "that was . . . a mistake."[83]  Zelazny testified: "[O]f that $200,000 [sale price,] there was a big portion of that . . . was the goodwill which is owned by me not by the practice.  And so, I mean, that was divvied up where I think . . . the goodwill amount should have gone to me as the individual who was responsible for the goodwill."[84]

### 7.  Zelazny's bankruptcy case

On October 26, 2020, Zelazny filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code, commencing Case No. 20-50976.[85]  Zelazny's filed schedules show that at the time he filed for bankruptcy, he had assets worth $28,270.64 and total liabilities of $244,007.64.[86]

### 8.  This adversary proceeding

On June 25, 2021, the Trustee filed his three-count Complaint against Myles Davis and Dentalkeeping, commencing this adversary proceeding.  All three counts of the Complaint are against both Defendants.

Count I of the Complaint seeks to avoid and recover the $90,000.00 transfer to Dentalkeeping that was made for the benefit of Myles Davis out of the proceeds of the May 1, 2017 Sale Agreement (the "Transfer").  The Trustee alleges in Count I that the Transfer was in the form of a $90,000.00 promissory note to Dentalkeeping as part of the $200,000.00 Sale Price.

---

[83]  *Id.* (testimony of Zelazny) at 101.

[84]  *Id.*

[85]  Docket # 1 in Case No. 20-50976.

[86]  Docket # 9 ("Summary of Your Assets and Liabilities, etc.") in Case No. 20-50976 at 1.

26

Count I alleges that the Debtor Zelazny made the Transfer "with the intent to hinder, delay, or defraud" his creditors" (a claim for intentional fraudulent transfer, later withdrawn), and that the Transfer was constructively fraudulent, because Zelazny did not receive reasonably equivalent value for the Transfer, and he made the Transfer when he was insolvent or the Transfer made him insolvent.

Count II seeks $90,000.00 in damages for the Defendants' alleged breach of the August 2016 Agreement. The principal breach alleged is the Defendants' receipt of the $90,000.00 out of the proceeds of the sale of assets of Zelazny and of Zelazny PC, allowing the Defendants to be repaid the amount they had allegedly invested in Zelazny PC. The Trustee alleges that the Defendants were not entitled to be repaid under the terms of the August 2016 Agreement. Other alleged breaches are Myles Davis's failure to make Zelazny a member of Dentalkeeping, his failure to cause Dentalkeeping to pay the full $90,000.00 in capital contributions over to or for the benefit of Zelazny and Zelazny PC as required by the August 2016 Agreement, and Dentalkeeping's failure to properly manage Zelazny PC's operations.

Count III of the Complaint seeks disallowance of any claims the Defendants filed in the bankruptcy case, under 11 U.S.C. § 502(d). To date, neither of the Defendants have filed a proof of claim in Zelazny's bankruptcy case.

**VI. Discussion**

**A. The August 2016 Agreement was an enforceable agreement, and was the final agreement of the parties.**

The first issues in this adversary proceeding are whether the August 2016 Agreement was an enforceable agreement, and whether it was the final agreement between the parties. The Court

finds and concludes that it was both an enforceable agreement ad the final agreement of the parties.

The Defendants contend that the August 2016 Agreement was merely a non-binding and unenforceable agreement to make an agreement in the future, and that it was later modified by an oral agreement of the parties. The Court rejects these arguments.

Michigan case law recognizes that agreements like the August 2016 Agreement may be considered binding and enforceable.

> **A contract to make a subsequent contract is not per se unenforceable; in fact, it may be just as valid as any other contract.** 1 Corbin, Contracts, § 29, p. 84; see *Hansen v. Catsman*, 371 Mich. 79, 123 N.W.2d 265 (1963). Like any other contract, a contract to make a contract can fail for indefiniteness if the trier of fact finds that it does not include an essential term to be incorporated into the final contract. *Socony-Vacuum Oil Co., Inc., v. Waldo*, 289 Mich. 316, 323, 286 N.W. 630 (1939). Similarly, if the agreement is conditioned on the happening of a future event that, through no fault of the parties, never happens, liability does not attach. *Professional Facilities Corp. v. Marks*, 373 Mich. 673, 678, 131 N.W.2d 60 (1964): "The conditions upon which defendants' liability for a fee were to depend are not alleged to have been fulfilled at any time."
>
> **. . . The fact that additional contracts may have been contemplated and mentioned in the letter [of intent] does not invalidate any agreement actually reached.** Professor Corbin (1 Corbin, Contracts, § 29, pp. 86–88) warns:
>
>> "We must not jump too readily to the conclusion that a contract has not been made from the fact of apparent incompleteness. People do business in a very informal fashion, using abbreviated and elliptical language. **A transaction is complete when the parties mean it to be complete. It is a mere matter of interpretation of their expressions to each other, a question of fact."**
>
> Whether the parties intend to be bound only by a formally written

and executed final document is a question of fact, not a question of law; in most cases the question is properly left to the jury. Corbin, § 30, p 97.

*Opdyke Inv. Co. v. Norris Grain Co.*, 320 N.W.2d 836, 838 (Mich. 1982) (emphasis added).

>     **It is well-recognized that it is possible for parties to make an enforceable contract binding them to prepare and execute a subsequent agreement. In such a case, where agreement is expressed on all essential terms, the instrument is considered a contract**, and is considered a mere memorial of the agreement already reached. 1 Corbin on Contracts, § 29. It is further to be noted, however, that "If the document or contract that the parties agree to make is to contain any material term that is not already agreed on, no contract has yet been made; and the so-called 'contract to make a contract' is not a contract at all." Corbin on Contracts, supra, p. 68. See, also, 6 Michigan Law and Practice, Contracts, § 27.
>
>     As noted in 1 Restatement, Contracts, § 26, p. 33, **'Mutual manifestations of assent that are in themselves sufficient to make a contract will not be prevented from so operating by the mere fact that the parties also manifest an intention to prepare and adopt a written memorial thereof**; but other facts may show that the manifestations are merely preliminary expressions.'

*Hansen v. Catsman*, 123 N.W.2d 265, 266 (Mich. 1963) (emphasis added).

The August 2016 Agreement contained all of the material terms of the parties' agreement, even though it stated that it was "an outline for a definitive agreement" the parties intended to enter into.[87] The August 2016 Agreement named the parties to the agreement (Myles Davis, Zelazny, and Zelazny PC), who were all competent to enter into a contract; it stated the lawful purposes of the agreement; it described the steps that would be taken to accomplish the purposes; it detailed the obligations of the parties and the services to be performed under the agreement and

---

[87] American Heritage Dictionary 882 (2d College Ed. 1985) (defining "outline," in relevant part, as a "general description covering the main points of a subject").

by whom; and it stated the consideration to be paid in return for the obligations incurred and services performed. It did not leave any terms open to be decided in future negotiations and it was not conditioned on the happening of a future event. Additionally, the August 2016 Agreement was signed by Myles Davis, Zelazny, as President of Zelazny PC, and Zelazny, individually, thereby showing each of the signing parties' consent to be bound by the terms of August 2016 Agreement.

Furthermore, the August 2016 Agreement stated that it was transferable and would survive the death or disability of Zelazny, or the sale of the dental practice. In this regard, the August 2016 Agreement stated: "Upon death or disability of Zelazny, or sale of managed practices, Zelazny, PC and [Dentalkeeping] shall be bound by this service agreement. . . . This agreement shall be transferable by [Dentalkeeping] to a third party."[88] These provisions further show that the parties believed that the respective obligations in the August 2016 Agreement were binding on them, upon execution of that agreement, and that the August 2016 Agreement was a "memorial of the agreement already reached" by the parties, and an enforceable contract. If the August 2016 Agreement was not an enforceable contract, there would be nothing to transfer, and there would be no binding obligations to survive the death or disability of Zelazny or the sale of the dental practice. If the parties did not intend for the August 2016 Agreement to be a binding contract, these provisions would be superfluous. And under Michigan law, "each word of the contract must be given effect, if possible." *Smith v. Smith*, 823 N.W.2d 114, 116 (Mich. Ct. App. 2011).

Not only do the words of the August 2016 Agreement evidence an intent by the parties to

---

[88] August 2016 Agreement (PX-2) at 2.

be bound by its terms upon its execution, but also the conduct of the parties after executing that agreement further evidences this. Upon the execution of the August 2016 Agreement, the parties began performing according to the terms of that agreement, and the parties continued to perform according to the terms of the agreement for several months, until they decided to end their relationship. This conduct of the parties further supports the conclusion that the parties intended to enter into an enforceable contract upon the execution of that agreement. *See* Corbin on Contracts § 29 at 46 (One Volume Ed. 1952) (explaining that "[t]he court will be more ready to find that the apparently incomplete agreement was in fact complete . . . in [a] case [where] the parties have already rendered some substantial performance or have taken other material action in reliance upon their existing expressions of agreement" and that "[t]he fact that they have so acted is itself a circumstance bearing upon the completeness of their agreement").

Myles Davis argues that even if the August 2016 Agreement was an enforceable contract between the parties, it was not the *final* agreement between the parties, because that agreement was later orally modified. The Court disagrees, and finds that the terms of the August 2016 Agreement were **not** later modified. Not only was the August 2016 Agreement an enforceable contract between the parties, but also it was the *final* agreement between the parties. The Court finds that the allegation of Myles Davis, in his affidavit and during his testimony at trial, that the August 2016 Agreement was orally modified, lacks credibility, for the following reasons.

First, the Court notes that Myles Davis's oral modification argument is a relatively new argument. The Debtor's bankruptcy case was filed on October 26, 2020. This adversary proceeding was filed June 25, 2021. The terms of the August 2016 Agreement were pled in the Trustee's Complaint, and were the basis for all of the counts of the Complaint. Yet, Myles Davis

and Dentalkeeping did not even hint that the August 2016 Agreement had been orally modified in their answer to the Trustee's Complaint, filed on August 2, 2021.[89]  Rather, the first time Myles Davis made the oral modification argument was in his affidavit executed on January 13, 2022, almost 7 months after the adversary proceeding was filed.[90]  This tends to show that this self-serving argument was fabricated, after Myles Davis further considered the legal ramifications of the terms of the August 2016 Agreement.

Not only did the Defendants' Answer to the Complaint fail to allege any modification of the August 2016 Agreement, but also that Answer, which the Defendants never amended, admitted in several places that the parties actually entered into and performed under the August 2016 Agreement.  For example, the Answer stated the following:

> 9. . . . Defendants admit that on August 22, 2016, an agreement for business support was entered into and that, under such agreement, Dentalkeeping, LLC was hired by Zelazny PC for certain administrative and bookkeeping functions.
> . . . .
>
> 36.  Defendants deny the allegation in paragraph 36 that the Defendants did not perform their obligations under the August 22, 2016 Agreement.  Defendants deny the allegation in paragraph 36 that Defendant failed to pay the $90,000.00 as untrue. . . . Further, the Defendants deny the allegations in paragraph 36 as untrue that Defendants failed to pay $90,000.00 to debtor or on behalf of Zelazny PC.  Moreover, the Defendants deny as untrue that Defendants failed to properly manage the operations of  Zelazny PC as contemplated in the August 22, 2016 Agreement.
>
> 37.  Defendants deny the allegations in paragraph 37 as untrue that there was a breach of the August 22, 2016 Agreement . . . .
> . . . .

---

[89] *See* Docket # 9.

[90] *See* Tr. of Day 1 of Trial (Docket # 97) (testimony of Myles Davis) at 86 (discussing PX-9).

## SPECIAL AND/OR AFFIRMATIVE DEFENSES

. . . .

> 7.  The [D]ebtor entered into the August 22, 2016 Partnership
> & Business & Support Services Agreement as an arms-length
> transaction with knowledge, full capacity, a clear understanding of
> his agreement with Defendant . . . .
>
> . . . .
>
> 10.  Defendants fully performed and adhered to their
> obligations in the August 22, 2016 Agreement and the May 1, 2017
> Agreement.[91]

Second, during his testimony at trial, Myles Davis could not recall many of the details about the alleged oral modification of the August 2016 Agreement.  For example, he could not recall the date on which the alleged oral modification occurred.  He could not even recall the month when the alleged oral modification occurred, *i.e.*, whether it allegedly occurred in the month of March 2017 or in the month April 2017.  He also could not recall the events that allegedly led the parties to enter into an oral modification of the August 2016 Agreement.[92]  For example, he could not recall if it allegedly occurred when the Debtor was having trouble paying rent.[93]

Third, there is no corroborating evidence that after they signed the August 2016 Agreement, the parties ever had further negotiations over the terms of that agreement.  There are no email exchanges or other written communications in the record evidencing further negotiations about the terms in the August 2016 Agreement, and there is no evidence that Myles

---

[91]  "Defendants' Answer to Adversary Complaint" (Docket # 9) (capitalization and underlining in original).

[92]  *See supra* note 42 and accompanying text.

[93]  *See id.*

33

Davis presented Zelazny with any drafts or documents varying or modifying the terms of the August 2016 Agreement. This further supports the Court's conclusion that the August 2016 Agreement was the *final* agreement between the parties.

Fourth, Zelazny denied at trial that there was any oral modification of the August 2016 Agreement, and the Court finds that trial testimony of Zelazny to be credible. Zelazny testified that he expected there to be another document further memorializing the terms of the partnership to which the parties had already agreed, but because there were no further meetings between the parties, and he never received any additional papers to review and sign, he believed that the August 2016 Agreement was the final agreement.[94]

Fifth, the parties' practice and course of conduct was to memorialize the terms of their agreement in a writing signed by the parties to that agreement. The August 2016 Agreement was such a writing. And the August 2016 Agreement contemplated another "definitive agreement that [would] be mutually agreed on by both parties" incorporating the terms outlined in that agreement. It is simply not credible that after formalizing the terms of their agreement and contemplating an even more detailed future written agreement between the parties, that the parties would not put into a signed writing the terms of any modification of their written agreement.

For all of these reasons, the Court finds and concludes that August 2016 Agreement was an enforceable agreement, and was the *final* agreement between the parties.

**B. The $90,000.00 Myles Davis was to pay to fund Dentalkeeping was a capital contribution to Dentalkeeping, not a loan to Dentalkeeping, and not a loan to Zelazny or Zelazny PC.**

---

[94] *See supra* note 25 and accompanying text.

The Count finds that under the August 2016 Agreement, Myles Davis was to make a $90,000.00 capital contribution to Dentalkeeping,, rather than a loan to Dentalkeeping or a loan to either Zelazny or Zelazny PC.

Under the terms of the August 2016 Agreement, Myles Davis was to "fund [Dentalkeeping] with up to $90,000"; Zelazny was "not required to make any **capital contributions**"; and "[a]ll **capital contribution[s]** required [were] the responsibility of [Myles] Davis."[95] The August 2016 Agreement stated further that "[i]n every case **capital** contributed shall be repaid prior to guaranteed payments or distributions of any kind (except doctor compensation)" and that "**[c]apital** calls shall be made at the sole discretion of Davis."[96]

In *Reicher v. SET Enters., Inc.*, 770 N.W.2d 902, 907 (Mich. Ct. App. 2009), the court explained that, under Michigan law, where the terms of a contract are unambiguous, courts interpret and enforce the contract according to the plain meaning of its terms:

> Michigan courts enforce contracts. *Coates*[ *v. Bastian Bros., Inc.*, 276 Mich. Ct. App. 498,] 503–504, 741 N.W.2d 539[, 543 (2007)]. We enforce contracts according to their terms, as a corollary to the parties liberty to enter into a contract. *Rory v. Continental Ins. Co.*, 473 Mich. 457, 468, 703 N.W.2d 23 (2005). We examine contractual language and give the words their plain and ordinary meanings. *Wilkie v. Auto–Owners Ins. Co.*, 469 Mich. 41, 47, 664 N.W.2d 776 (2003). An unambiguous contractual provision reflects the parties['] intent as a matter of law, and "[i]f the language of the contract is unambiguous, we construe and enforce the contract as written." *Quality Products & Concepts Co. v. Nagel Precision, Inc.*, 469 Mich. 362, 375, 666 N.W.2d 251 (2003). Courts may not create ambiguity when contract language is clear. *Grosse Pointe Park v. Michigan Muni. Liability & Prop. Pool*, 473 Mich. 188, 198, 702 N.W.2d 106 (2005). Rather, this

---

[95] August 2016 Agreement (PX-2) at 1 (emphasis added).

[96] *Id.* (emphasis added).

> Court must honor the parties' contract, and not rewrite it. *McDonald v. Farm Bureau Ins. Co.*, 480 Mich. 191, 197, 747 N.W.2d 811 (2008); *see also Coates, supra* at 511 n. 7, 741 N.W.2d 539.

*Id.*

The August 2016 Agreement repeatedly used the term "capital" when referencing money to be contributed by Dentalkeeping and by Myles Davis, its sole shareholder, or to money to be repaid to Dentalkeeping on account of the money Myles Davis contributed to Dentalkeeping.

The common meaning of the word "capital" when used for accounting purposes is: "The funds *contributed* to a business by the owner or stockholders."[97]  To "contribute" means to "give."[98]  The August 2016 Agreement clearly and unambiguously required Myles Davis, as owner of Dentalkeeping, to make "capital contributions" to it, or in other words, to contribute funds to it of "up to $90,000.00."  The required contributions of Myles Davis were not conditioned on a promise that the money will be repaid.  There was no obligation to repay the money contributed unless and until there were profits.  The contributions therefore share the characteristics of what is commonly understood as an investment.  To "invest" means "[t]o commit (money or capital) in order to gain profit or interest."[99]  Under the August 2016 Agreement, if Zelazny PC expanded its business as contemplated, Myles Davis was "entitled to 67% of profits."[100]

In stark contrast to the multiple times the funds to be contributed by Myles Davis is

---

[97]  American Heritage Dictionary 236 (2d College Ed. 1985) (emphasis added).

[98]  *See id.* at 318.

[99]  *Id.* at 675.

[100]  August 2016 Agreement (PX-2) at 1.

referred to as a capital contribution in the August 2016 Agreement, the word "loan" does not appear a single time in that agreement. And the terms of repayment do not share the characteristics of what is commonly referred to as a loan. A "loan" commonly means "[a] sum of money *lent* at interest."[101] To lend money means "[t]o provide (money) *temporarily on the condition that the amount borrowed be returned, usually with an interest fee.*"[102] As stated above, the required contributions by Myles Davis under the August 2016 Agreement were not conditioned on a promise that the amounts contributed be repaid, or even on a promise that if the amounts contributed were repaid due to there being profits, they were to be repaid with interest.

Under Michigan law, the Court must construe the August 2016 Agreement consistent with the intent of the parties as reflected by the plain meaning of the words used in that contract. The Court therefore concludes that the funds Myles Davis was required to contribute to Dentalkeeping were capital contributions, and not loans to anyone.

## C. None of the funding Myles Davis provided under the August 2016 Agreement was a loan, by either Myles Davis or Dentalkeeping, to Zelazny or Zelazny PC.

Under the August 2016 Agreement, the capital contributions of "up to $90,000" that Myles Davis was required to contribute to Dentalkeeping were, in turn, required to be used by Dentalkeeping "to pay down credit card debt of Zelazny and [Zelazny] PC and to fund marketing efforts."[103] Myles Davis alleges that under the final agreement of the parties, which he alleges was between Dentalkeeping, Zelazny, and Zelazny PC, the monies from Dentalkeeping used to

---

[101] American Heritage Dictionary at 738 (emphasis added).

[102] *Id.* at 723 (emphasis added).

[103] August 2016 Agreement (PX-2) at 1.

pay down credit card debt and for marketing were interest-free unsecured *loans* from Dentalkeeping to Zelazny or Zelazny PC.[104]  The Court disagrees.

First, the Court notes that it has already concluded that the August 2016 Agreement was the final agreement between the parties, and that that agreement was not orally modified. Therefore, it is the terms of the August 2016 Agreement which control whether Dentalkeeping made loans to Zelazny or Zelazny PC.  And that agreement said nothing about any loan.

Second, the Court notes that although Myles Davis alleges that the funds Dentalkeeping paid for credit card debt and marketing efforts were interest-free loans to be repaid in 6 months, he has not produced any documents that would typically accompany and evidence a loan.  Myles Davis admits that there are no promissory notes by Zelazny or Zelazny PC containing a promise to repay the funds advanced; no guarantees of repayment signed by either Zelazny or Zelazny PC; and no security agreements signed by either Zelazny or Zelazny PC securing the purported loans (although Davis says that this is because the loans were not secured).  There are also no documents which state an interest rate, a maturity date, or a repayment schedule for the purported loans.  It is not even clear from Myles Davis's testimony whether the alleged loans were to Zelazny or to Zelazny PC.  All of this is strong evidence that the advances by Myles Davis, through Dentalkeeping, were not loans.

"A loan is 'an advance of money with an absolute promise to repay[,]' and a loan does not necessarily need to be evidenced by a writing. M.C.L. § 566.132."  *Simon v. Short* (*In re Oakland Physicians Med. Ctr., L.L.C.*), 596 B.R. 587, 616 (Bankr. E.D. Mich. 2019), *aff'd*, 620 B.R. 870 (E.D. Mich. 2020), *aff'd,* 70 Bankr. Ct. Dec. 173, No. 20-1775, 2021 WL 4077546 (6th

---

[104]  *See supra* notes 31-36 and accompanying text.

Cir. Sept. 8, 2021) (citing *People v. Lee*, 526 N.W.2d 882 (Mich. 1994)). Although no writing

evidencing a loan is required, the advances by Dentalkeeping were made based on the August

2016 Agreement, and that agreement does not characterize monies to be paid by Dentalkeeping

as a loan, nor can the repayment terms in that agreement be construed as an unconditional

promise that the monies advanced would be repaid. "Without an unconditional promise to pay,

there is no loan." *Id.* at 619.

Third, in contrast to the lack of documents to support Myle Davis's loan argument, there

is documentary evidence showing that the money Dentalkeeping paid for credit card debts and

marketing was *not* a loan. Zelazny PC's 2016 federal income tax return does not list any loans

from Dentalkeeping or Myles Davis. That tax return does list a loan, but it was an unrelated

shareholder loan from Zelazny to Zelazny PC. Greig Davis, Myles Davis's father, prepared this

tax return, and he did so with information that Myles Davis provided to him while Myles Davis

was acting as CFO, CEO, and bookkeeper of Zelazny PC. This tax return is strong evidence that

both Greig Davis and Myles Davis believed that the money Dentalkeeping contributed under the

August 2016 Agreement was *not* a loan.

Fourth, consideration of the eleven factors in *Roth Steel Tube Co. v. Comm'r of Internal

Revenue*, 800 F.2d 625, 630 (6th Cir.1986) (the "*Roth Steel* factors"), further shows that the

advances Dentalkeeping made under the August 2016 Agreement were not loans. In *Bayer Corp.

v. Masco Tech., Inc.* (*In re AutoSytle Plastics, Inc.*), 269 F.3d 726, 749-53 (6th Cir. 2001), the

Sixth Circuit Court of Appeals applied the *Roth Steel* factors to determine whether alleged debt

transactions should be re-characterized as equity contributions. In *Simon v. Short* (*In re Oakland

Physicians Med. Ctr., L.L.C.*), 596 B.R. 587, 619 (Bankr. E.D. Mich. 2019), *aff'd*, 620 B.R. 870

(E.D. Mich. 2020), *aff'd,* 70 Bankr. Ct. Dec. 173, No. 20-1775, 2021 WL 4077546 (6th Cir. Sept. 8, 2021) (citing *People v. Lee*, 526 N.W.2d 882 (Mich. 1994)), the court held that "the *Roth Steel* factors are equally relevant in evaluating whether an advance is debt or a capital contribution when making the determination of the reasonably equivalent value element under § 548(a)(1)(B) and M.C.L. § 566.35." The *Oakland Physicians* court listed and analyzed the following *Roth Steel* factors to determine "whether a loan existed and if so under what terms" based on four unsigned promissory notes and purportedly missing promissory notes. *See id.* at 618-24:

> (1) the names given to the instruments, if any, evidencing the indebtedness; (2) the presence or absence of a fixed maturity date and schedule of payments; (3) the presence or absence of a fixed rate of interest and interest payments; (4) the source of repayments; (5) the adequacy or inadequacy of capitalization; (6) the identity of interest between the creditor and the stockholder; (7) the security, if any, for the advances; (8) the corporation's ability to obtain financing from outside lending institutions; (9) the extent to which the advances were subordinated to the claims of outside creditors; (10) the extent to which the advances were used to acquire capital assets; and (11) the presence or absence of a sinking fund to provide repayments. *Roth Steel*, 800 F.2d at 630. No one factor is controlling or decisive. *Ibid.* The factors must be considered within the particular circumstances of each case. *Ibid.* We note that ''[t]he more [a transaction] appears to reflect the characteristics of . . . an arm's length negotiation, the more likely such a transaction is to be treated as debt.'' *In re Cold Harbor* [*Assocs., L.P.*], 204 B.R. [904,] 915 [Bankr. E.D. Va. 1997)].

> *Id*. at 749–50.

This Court agrees with *Oakland Physicians* that the *Roth Steel* factors may be used in helping to determine whether a purported debt transaction is a loan, and will consider those factors in its analysis of whether Dentalkeeping's advances were loans or capital contributions.

40

*Factor 1 - the names given to the instruments, if any, evidencing the indebtedness*

In analyzing the first factor, *AutoStyle Plastics* stated that "[t]he absence of notes or other instruments of indebtedness is a strong indication that the advances were capital contributions and not loans." *AutoStyle Plastics*, 269 F.3d at 750 (citing *Roth Steel*, 800 F.2d at 631). Here, there are no instruments evidencing indebtedness. This factor, therefore, strongly indicates that Dentalkeeping's advances were not loans.

*Factor 2 - the presence or absence of a fixed maturity date and schedule of payments*

In analyzing the second factor, *AutoStyle Plastics* stated that "[t]he absence of a fixed maturity date and a fixed obligation to repay is an indication that the advances were capital contributions and not loans. [*Roth Steel,* 800 F.2d at 631]." *Id.* Here, although Myles Davis alleges that the loans were to be repaid in 6 months, there is no document evidencing a fixed maturity date for the purported loan by Dentalkeeping or a fixed obligation to repay Dentalkeeping's purported loan, and the August 2016 Agreement does not support the allegation of a 6-month repayment schedule. Therefore, this factor is an indication that the advances by Dentalkeeping were not loans.

*Factor 3 - the presence or absence of a fixed rate of interest and interest payments*

In analyzing this factor, *AutoStyle Plastics* stated that "[t]he absence of a fixed rate of interest and interest payments is a strong indication that the advances were capital contributions rather than loans. [*Roth Steel,* 800 F.2d at 631]." *Id.* at 750-51. Here, Myles Davis alleges that the purported loans had an interest rate of 0% and therefore there were no interest payments. Therefore, this factor indicates that Dentalkeeping's advances were not loans.

*Factor 4 - the source of repayments*

41

In analyzing the fourth factor, *AutoStyle Plastics* stated: "If the expectation of repayment depends solely on the success of the borrower's business, the transaction has the appearance of a capital contribution. *Roth Steel*, 800 F.2d at 631." *Id.* at 751. Here, it is clear from the August 2016 Agreement that Dentalkeeping would be paid a sizable percentage of the profits, if and when when Zelazny PC had profits. Therefore, it appears from the terms of the August 2016 Agreement that the advances Dentalkeeping was required to make under that agreement were not loans.

*Factor 5- the adequacy or inadequacy of capitalization*

In analyzing the fifth factor, *AutoStyle Plastics* stated: "Thin or inadequate capitalization is strong evidence that the advances are capital contributions rather than loans. [*Roth Steel,* 800 F.2d] at 630." *Id.* Here, the whole impetus for the parties entering into August 2016 Agreement was that before that agreement was made, Zelazny and Zelazny PC were in such dire financial straits and had such a lack of working capital that Zelazny told Greig Davis that he was going to file bankruptcy. These circumstances are therefore strong evidence that Dentalkeeping's advances were capital contributions rather than loans.

*Factor 6- the identity of interest between the creditor and the stockholder*

In analyzing the sixth factor, *AutoStyle Plastics* stated:

> If stockholders make advances in proportion to their respective stock ownership, an equity contribution is indicated. [*Roth Steel,* 800 F.2d at 630]." On the other hand, a sharply disproportionate ratio between a stockholder's percentage interest in stock and debt is indicative of bona fide debt. *Ibid.* "Where there is an exact correlation between the ownership interests of the equity holders and their proportionate share of the alleged loan . . . this evidence standing alone is almost . . . overwhelming." *In re Cold Harbor*, 204 B.R. at 919.

*Id.* Because Myles Davis was not a licensed dentist, he could not be a shareholder in Zelazny PC, and could not share in the profits of Zelazny PC based on a shareholder interest. *See* Mich. Comp. Laws §§ 450.1283(1)- 450.1283(2), 450.1288(1). For this reason, this *AutoStyle Plastics* factor is not relevant in this case.

*Factor 7- the security, if any, for the advances*

In analyzing the seventh factor*, AutoStyle Plastics* explained that "[t]he absence of a security for an advance is a strong indication that the advances were capital contributions rather than loans. *Roth Steel*, 800 F.2d at 631." *Id.* at 752. Here, there are no security agreements relating to Dentalkeeping's advances and Myles Davis alleges that the purported loans Dentalkeeping made were unsecured. Therefore, this factor weighs in favor of finding Dentalkeeping advances were not loans.

*Factor 8- the corporation's ability to obtain financing from outside lending institutions*

In analyzing the eight factor, *AutoStyle Plastics* explained that "[w]hen there is no evidence of other outside financing, the fact that no reasonable creditor would have acted in the same manner is strong evidence that the advances were capital contributions rather than loans. [*Roth Steel*, 800 F.2d at 631]." *Id.* Here, there is no evidence of any outside financing. Zelazny was using his own funds and incurring debt on his personal credit cards to fund his dental practices. He had incurred substantial credit card debt and had fallen behind on his rent, and had considered filing bankruptcy, before he entered into the August 2016 Agreement. This factor therefore strongly weighs in favor of finding that the Dentalkeeping advances were capital contributions and not loans.

*Factor 9- the extent to which the advances were subordinated to the claims of outside*

*creditors*

In analyzing the ninth factor, *AutoStyle Plastics* stated: "Subordination of advances to claims of all other creditors indicates that the advances were capital contributions and not loans. [*Roth Steel*, 800 F.2d.] at 631-32." Under the August 2016 Agreement, the advances by Dentalkeeping were to be used, in large part, to pay off existing credit card debt. In substance then, such advances were subordinated to the claims of other creditors. This weighs in favor of finding that these advances were, in substance, capital contributions.

*Factor 10- the extent to which the advances were used to acquire capital assets*

In analyzing the tenth factor, *AutoStyle Plastics* stated that the "[u]se of advances to meet the daily operating needs of the corporation, rather than to purchase capital assets, is indicative of bona fide indebtedness. [*Roth Steel*, 800 F.2d.] at 632." *Id.* Here, although Dentalkeeping's advances were used for paying off debt and for working capital that enabled Zelazny PC to meet daily operating needs, the primary purpose of the August 2016 Agreement was to expand the dental practice of Zelazny PC by acquiring other dental practices. The August 2016 Agreement states that "[Dentalkeeping] and [Zelazny] PC desire to operate and manage ten dental practices within 5 years."[105] But the funds contributed were not used to purchase any other dental practices. Therefore, on balance, this factor weighs slightly in favor of finding that Dentalkeeping's advances were loans, not capital contributions.

*Factor 11- the presence or absence of a sinking fund to provide repayments*

In analyzing the eleventh factor, *AutoStyle Plastics* stated that "[t]he failure to establish a sinking fund for repayment is evidence that the advances were capital contributions rather than

---

[105] *Id.*

loans. [*Roth Steel*, 800 F.2d. at 632]." *Id.* at 753. Here, there was no fund established for the payment of Dentalkeeping's advances. "Because [Dentalkeeping's] alleged loans were unsecured, a reserve or a sinking fund would be required to assure repayment." *See Oakland Physicians*, 596 B.R. at 624. This factor therefore weighs in favor of finding that Dentalkeeping's advances were not loans.

On balance, the *Roth Steel* factors weigh very heavily in favor of finding that Dentalkeeping's advances were not loans. This further supports the Court's conclusion that none of the funding Myles Davis and Dentalkeeping provided under the August 2016 Agreement was a loan, by either Myles Davis or Dentalkeeping, to Zelazny or Zelazny PC.

### D. Before making the May 1, 2017 Sale Agreement, neither Zelazny nor Zelazny PC had any obligation to pay any of the sale proceeds to either Myles Davis or Dentalkeeping.

Because none of the funding Myles Davis provided under the August 2016 Agreement was a loan by either Myles Davis or Dentalkeeping to Zelazny or Zelazny PC, and such funding was not required to repaid under that agreement unless and until Zelazny PC earned profits, it follows that before making the May 1, 2017 Sale Agreement, neither Zelazny nor Zelazny PC had any obligation to pay any of the sale proceeds to either Myles Davis or Dentalkeeping. Myles Davis admits that Zelazny PC earned no profits.[106] As a result, Dentalkeeping was never entitled to receive any payments under the terms of the August 2016 Agreement.

Therefore, to the extent that the $90,000.00 in sales proceeds transferred to Dentalkeeping under the May 1, 2017 Sale Agreement were in exchange for assets that the Debtor owned in his personal capacity, the Debtor received no value for the exchange, there being no antecedent debt

---

[106] *See* Tr. of Day 1 of Trial (Docket # 97) (testimony of Myles Davis) at 71.

45

to satisfy by these payments. See Mich. Comp. Laws § 566.33 (stating that for purposes of Michigan's Uniform Voidable Transactions Act, "[v]alue is given for a transfer . . . if, in exchange for the transfer . . . an antecedent debt is . . . satisfied).

**E. By entering into the May 1, 2017 Sale Agreement, the Debtor Zelazny and Zelazny PC waived any breach of contract claim(s) that they had against either Myles Davis or Dentalkeeping. Because of that waiver, and because the Trustee did not otherwise prove his breach of contract claim, the Trustee's breach of contract claim based on the August 2016 Agreement (Count II) fails.**

According to the Trustee, because the condition precedent under the August 2016 Agreement to Dentalkeeping being paid (Zelazny PC earning profits) had not occurred, any payments made to Dentalkeeping under the May 1, 2017 Sale Agreement was a breach of the August 2016 Agreement. In Count II of the Complaint, based on this breach of contract theory, and other claimed breaches of contract, the Plaintiff Trustee seeks a money judgment against both Myles Davis and Dentalkeeping, in the amount of the $90,000.00 that Dentalkeeping received under the May 1, 2017 Sale Agreement.[107]

The Court finds and concludes that the Trustee does not have a valid breach of contract claim against the Defendants, based on the diversion of $90,000.00 of the sale proceeds to Dentalkeeping under the May 1, 2017 Sale Agreement, or otherwise. This is so because, by entering into the May 1, 2017 Sale Agreement, and thereby expressly agreeing to the payment of $90,000.00 of the sale proceeds to Dentalkeeping, the Debtor Zelazny waived any such breach of contract claim(s) that he had against either Myles Davis or Dentalkeeping. Because of that waiver, the Trustee's breach of contract claim based on the August 2016 Agreement (Count II) also is deemed waived.

---

[107] See Compl. (Docket # 1) at ¶¶ 33-38.

46

Because the Trustee brings the breach of contract claim in his capacity as successor to the interests of the bankruptcy Debtor, Zelazny, the bankruptcy estate is subject to any defenses the Defendants had to that claim against Zelazny. In *State Bank & Trust Co. v. Spaeth* (*In re Motorwerks, Inc.*), 371 B.R. 281, 288–89 (Bankr. S.D. Ohio 2007) (footnote omitted), the court explained:

> [A] Trustee may stand in the shoes of the debtor by bringing a cause of action belonging to the bankruptcy estate. [*Savage & Assocs., P.C. v. BLR Services SAS (In re Teligent, Inc.*), 307 B.R. 744, 747 (Bankr.S.D.N.Y.2004)]. Section 541(a)(1) creates a bankruptcy estate that encompasses "all legal or equitable interests of the debtor in property as of the commencement of the case" including causes of action that a debtor could assert. 11 U.S.C. § 541(a)(1); *Honigman v. Comerica Bank* (*In re Van Dresser Corp.*), 128 F.3d 945, 947 (6th Cir.1997). When a trustee pursues a cause of action under § 541(a), the trustee brings the action as successor to the debtor's interest in property and, as such, the trustee is subject to all defenses . . . that would have been available to the defendant against the debtor. *Lutz v. Chitwood (In re Donahue Securities, Inc.*), 304 B.R. 797, 799 n. 4 (Bankr.S.D.Ohio 2003).

*Id.*; *see also Taunt v. Coenen* (*In re Trans-Indus., Inc.*), 538 B.R. 323, 346 (Bank. E.D. Mich. 2015) ("When a trustee pursues a cause of action under § 541(a), the trustee brings the action as successor to the debtor's interest in property and, as such, the trustee is subject to all defenses . . ., that would have been available to the defendant against the debtor.").

Waiver is one of the traditional contract defenses under Michigan law. *See Rory v. Cont'l Ins. Co.*, 703 N.W.2d 23, 41–42 (Mich. 2005) (footnotes omitted) (explaining that "[a]s with any contract . . . [a] party may avoid enforcement of an 'adhesive' contract only by establishing one of the traditional contract defenses, such as fraud, duress, unconscionability, or waiver").

"'A waiver is a voluntary relinquishment of a known right.' *Dahrooge v. Rochester–German Ins. Co.*, 177 Mich. 442, 451–452, 143 N.W. 608 (1913)." *McDonald v. Farm Bureau Ins. Co.*, 747 N.W.2d 811, 819 (Mich. 2008).

> [P]arties to a contract are free to mutually waive or modify their contract notwithstanding a written modification or anti-waiver clause because of the freedom to contract. However, with or without restrictive amendment clauses, the principle of freedom to contract does not permit a party *unilaterally* to alter the original contract. Accordingly, mutuality is the centerpiece to waiving or modifying a contract, just as mutuality is the centerpiece to forming any contract.
>
> This mutuality requirement is satisfied where a waiver or modification is established through clear and convincing evidence of a written agreement, oral agreement, or affirmative conduct establishing mutual agreement to modify or waive the particular original contract.

*Quality Prods. & Concepts Co. v. Nagel Precision, Inc.*, 666 N.W.2d 251, 253–54 (Mich. 2003) (italics in original).

Here, there is clear and convincing evidence establishing a mutual agreement between Zelazny PC, Zelazny, Myles Davis and Dentalkeeping that Dentalkeeping be paid the $90,000.00 in the Sale Agreement. Zelazny knew that under the August 2016 Agreement, he and Zelazny PC had the right *not* to pay any money to Dentalkeeping or Myles Davis unless and until Zelazny PC had profits to split. Despite that knowledge and the fact that Zelazny PC did not have any profits to split, Zelazny, and Zelazny PC, voluntarily agreed with Myles Davis and Dentalkeeping that under the May 1, 2017 Sale Agreement with Tiffany Danyal, D.D.S., Dentalkeeping would receive $90,000.00 of the sale proceeds. Zelazny and Zelazny PC each signed that Sale Agreement.

The evidence shows that when Zelazny PC did not generate the expected profits, Myles Davis, Greig Davis, and Zelazny discussed various options for Zelazny PC, and ultimately decided that the best opinion would be for Zelazny to sell his dental practice. The evidence further shows that Greig Davis found the buyer for the dental practice, found Mark Adams, a lawyer, to draft the Sale Agreement, and instructed Mark Adams about what terms to include in that agreement. The evidence further shows that Zelazny was copied on the email exchanges between Mark Adams and Greig Davis in which terms to be included in the Sale Agreement were described. The email exchanges between Mark Adams and Greig Davis show that the payment to Dentalkeeping of $90,000.00 was always a term of any sale of the dental practice, though the method by which this payment was to made changed over time. The evidence further shows that on May 1, 2017, Zelazny and Zelazny PC executed the Sale Agreement under which Dentalkeeping received $90,000.00 of the sale proceeds.

The facts clearly show that Zelazny and Zelazny PC waived any breach of contract claim against Myles Davis and Dentalkeeping based on payments to either of them to which they were not entitled under the August 2016 Agreement. These facts also show that Zelazy and Zelazy PC waived any other claim of breach of contract by Myles Davis. The other breaches of contract alleged in Count II of the Complaint were the following:

> Defendants did not perform their obligations under the August 22, 2016 Agreement. Myles Davis failed to make the required capital contribution of $90,000.00, failed to make the debtor a member of Dentalkeeping, LLC, failed [to] cause the required $90,000.00 of funds to be contributed necessary to improve and expand the Zelazny PC dental practice, and failed to properly manage Zelanzy

PC's operations.[108]

The damages allegedly caused by these breaches and the "diversion of $90,000.00 of the sale proceeds," was the amount of $90.000.00, plus interest.[109]

In addition to the fact that Zelazny waived such claims of breach of contract, the Court concludes that the Trustee did not meet his burden of proving, by a preponderance of evidence, that any of these other breaches caused Zelazny or Zelazny PC any actual damages.

**F. By entering into, and closing on, the May 1, 2017 Sale Agreement, the Debtor Zelazny agreed to transfer, and did transfer, to Dentalkeeping, property *of the Debtor* worth $70,000.00, and that transfer is avoidable by the Trustee, as constructively fraudulent.**

For reasons the Court now will explain, the Court concludes that by entering into, and closing on, the May 1, 2017 Sale Agreement, the Debtor Zelazny agreed to transfer, and did transfer, to Dentalkeeping, *property of the Debtor* worth $70,000.00, and that transfer is avoidable by the Trustee, as constructively fraudulent.

The Court notes that in Count I of the Complaint, the Trustee originally sought to avoid the transfer of the entire $90,000.00 in sale proceeds paid to Dentalkeeping under the Sale Agreement, as both an intentional fraudulent transfer and as a constructively fraudulent transfer. But as the Final Pretrial Order stated, the Trustee withdrew his claim alleging an intentional fraudulent transfer under Mich. Comp. Laws § 566.34(1)(a).  That left in Count I of the Complaint only the claim for avoidance and recovery of the transfer as a constructive fraudulent transfer, under 11 U.S.C. §§ 544(b); Mich. Comp. Laws § 566.34(1)(b) ; Mich. Comp. Laws

---

[108]  Compl. (Docket # 1) at ¶ 36.

[109]  *See id.* at ¶ 38.

§ 566.35(1); and 11 U.S.C. § 550(a).[110]

Section 544(b)(1) of the Bankruptcy Code states, in relevant part:

> (b)(1) Except as provided in paragraph (2), the trustee may avoid any transfer of an interest of the debtor in property . . . that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title.

11 U.S.C. § 544(b)(1). The applicable law is Mich. Comp. Laws § 566.34(1)(b) and Mich.

Comp. Laws § 566.35(1). Section 566.34 states, in relevant part:

> (1) Except as otherwise provided in subsection (4), **a transfer made . . . is voidable as to a creditor**, whether the creditor's claim arose before or after the transfer was made . . ., **if the debtor made the transfer** . . . in either of the following circumstances:
> . . . .
> (b) **Without receiving a reasonably equivalent value in exchange for the transfer** . . ., and the debtor did either of the following:
>
> (i) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction.
>
> (ii) Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

Mich. Comp. Laws § 566.34 (emphasis added).

Section 566.35, states, in relevant part:

> (1) A transfer made . . . is voidable as to a creditor whose claim arose before the transfer was made . . . **if the debtor made the transfer** or incurred the obligation **without**

---

[110] Final Pretrial Order (Docket # 75) at 2 ¶ 2 ("Trustee's Claims").

> **receiving a reasonably equivalent value in exchange for
> the transfer . . . and the debtor was insolvent at that
> time or the debtor became insolvent as a result of the
> transfer** . . . .

Mich. Comp. Laws Ann. § 566.35 (emphasis added).

The first disputed element of the Trustee's constructive fraudulent transfer claim is whether the Debtor Zelazny received reasonably equivalent value for the transfer to Dentalkeeping of the Debtor Zelazny's interest in the sale proceeds under the May 1, 2017 Sale Agreement.

Because the Court has already decided that the $90,000.00 the Defendants allege that Dentalkeeping paid under the August 2016 Agreement was not a loan, the $90,000.00 Dentalkeeping received under the May 1, 2017 Sale Agreement does not constitute a transfer in exchange for the satisfaction of an antecedent debt. *See* Mich. Comp. Laws § 566.33 (stating, in relevant part: " Value is given for a transfer . . .  if, in exchange for the transfer . . ., an antecedent debt is . . .  satisfied.").

To determine if the Debtor Zelazny received reasonably equivalent value in exchange for what he transferred under the Sale Agreement, the Court must compare the value of what the Debtor Zelazny transferred with the value of what the Debtor Zelazny received in exchange for his transfer.

The Court finds that the value of the property sold to Tiffany Danyal, D.D.S. under the May 1, 2017 Sale Agreement was as stated and allocated in Section 3 of the Sale Agreement. There the parties agreed and stated that the value of the property owned by Zelazny PC was $50,000.00, and the value of the property owned by the Debtor Zelazny was $150,000.00.  As

stated in Part V.5 of this Opinion, above, those agreed values were:

| | |
|---|---|
| Equipment, fixtures, furniture and Supplies as listed on Exhibit 1a | $ 50,000.00 |
| **Sellers' Goodwill** | **$140,000.00** |
| **Covenant Not to Compete** | **$10,000.00** |
| Total | $200,000.00[111] |

These property values were put in the Sale Agreement at the direction of Greig Davis, the father of Myles Davis,[112] who among other things was a CPA with more than 25 years experience in working with dental groups, and who had substantial experience in working on the sale of dental practices.[113] Greig Davis also was a certified valuation analyst.[114] Zelazny and Zelazny PC agreed to these property values, when they signed the May 1, 2017 Sale Agreement. And Myles Davis and Dentalkeeping (of which Myles Davis was the controlling and only LLC member) knowingly agreed to these values as well, when they actively participated with Greig Davis and acquiesced in the drafting and closing of the May 1, 2017 Sale Agreement. According to Myles Davis, these values were intended to be "fair market value," and the stated allocation of values was "pretty much industry standard" and "industry normal breakdowns."[115]

Based on these property values, $50,000.00 worth of the property sold was property of

---

[111] May 1, 2017 Sale Agreement (PX-14) at 3 ¶ 3.a (bold added).

[112] *See* Part V.5 of this Opinion.

[113] *See* Part V.2 of this Opinion.

[114] *See id.*

[115] Tr. of Day 1 of Trial (Docket # 97) (testimony of Myles Davis) at 122-23.

Zelazny PC (the equipment, fixtures, etc.),[116] and for that, Zelazny PC received only $30,000.00 (the down payment paid by Tiffany Danyal, D.D.S at closing, which went into Zelazny PC's bank account and was used to pay bills of Zelazny PC).

The other $150,000.00 of the $200,000.00 worth of property sold – (Sellers' Goodwill and Covenant Not to Compete) – was property of Zelazny, individually.[117] So in the transaction, the Debtor Zelazny gave up property he owned that was worth $150,000.00. But he only received $80,000.00 in return. So in substance, Zelazny transferred to and for the benefit of Dentalkeeping and Myles Davis $70,000.00 more of his property than the value he received in exchange. That $70,000.00 was part of the $90,000.00 that was paid to Dentalkeeping under the Sale Agreement. Thus, the Debtor Zelazny received $70,000.00 less than the reasonably equivalent value for the property.

The Trustee proved, by a preponderance of the evidence, and the Court finds, that the Debtor Zelazny was insolvent at the time of the transfer of his property under the May 1, 2017 Sale Agreement, or was rendered insolvent thereby, within the meaning of Mich. Comp. Laws Ann. § 566.35(1). The Defendants did not seriously dispute this element at trial.

The concept of insolvency is defined in Mich. Comp. Laws Ann. § 566.32: "[a] debtor is insolvent if, at a fair valuation, the sum of the debtor's debts is greater than the sum of the debtor's assets." Mich. Comp. Laws Ann. § 566.32(1). And a debtor is "presumed to be insolvent" if the debtor "is generally not paying the debtor's debts as they become due other than

---

[116] *See, e.g.*, Tr. of Day 2 of Trial (Docket # 98) (testimony of Mark Adams) at 129; PX-14 (May 1, 2017 Sale Agreement) at pdf p. 18 (Bill of Sale).

[117] *See, e.g.*, Tr. of Day 1 of Trial (Docket # 97) (testimony of Zelazny) at 157-58.

as a result of a bona fide dispute . . . ." Mich. Comp. Laws Ann. § 566.32(2). When such a presumption arises, it must be rebutted by a preponderance of the evidence. *See id.*[118]

The evidence, including the testimony of the Debtor Zelazny, shows that at the time of the transfer of his property under the May 1, 2017 Sale Agreement, and thereafter, the Debtor Zelazny was generally not paying his debts as they became due.[119] Therefore, a presumption of insolvency arises, and the Defendants did not meet their burden of rebutting that presumption. In addition, at the time of the May 1, 2017 Sale Agreement transaction, Zelazny had undisputed debts that exceeded the value of his assets.[120] And the Sale Agreement transaction only deepened Zelazny's insolvency, because of the roughly $15,000.00 in 2017 tax liability he incurred as a result of the transaction.[121]

Therefore, the $70,000.00 transfer is avoidable by the Trustee as a constructively fraudulent transfer, based on 11 U.S.C. § 544(b)(1) and Mich. Comp. Laws § 566.35(1).[122]

Because the transfer of $70,000.00 of the $90,000.00 in sale proceeds to Dentalkeeping under the Sale Agreement is avoidable under Bankruptcy Code § 544, the value of the transfer

---

[118] "A debtor that is generally not paying the debtor's debts as they become due other than as a result of a bona fide dispute is presumed to be insolvent. The presumption imposes on the party against which the presumption is directed the burden of proving that the nonexistence of insolvency is more probable than its existence." *Id.*

[119] *See* discussion in Parts V.5 and V.6 of this Opinion; Tr. of Day 1 of Trial (Docket # 97) (testimony of Zelazny) at 171.

[120] *See* discussion in Part V.6 of this Opinion; Tr. of Day 1 of Trial (Docket # 97) (testimony of Zelazny) at 178 (as of May 1, 2017, "[t]he value of my assets was substantially less than the value of my liabilities at that time.")

[121] *See* Tr. of Day 1 of Trial (Docket # 97) (testimony of Zelazny) at 167, 172.

[122] In light of this, the Court does not need to decide whether the $70,000.00 transfer also is avoidable based on Mich. Comp. Laws § 566.34(1).

($70,000.00) is recoverable from both Dentalkeeping (the initial transferee) and Myles Davis (the sole member of Dentalkeeping and the person for whose benefit the transfer was made). Section 550(a)(1) of the Bankruptcy Code states, in relevant part:

> (a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544 . . . of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from--
>
>> (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or

.
11 U.S.C. § 550 (a)(1).

As for the transfer of the $50,000.00 worth of property of Zelazny PC that was sold in exchange for the $30,000.00 that Zelazny PC received for it, that transfer also was for less than reasonably equivalent value (*i.e.*, for $20,000.00 less than the value received by Zelazny PC). The Trustee argues that this was an "indirect" transfer of property of the Debtor Zelazny. But for a transfer to be avoidable under Bankruptcy Code § 544(b), the transfer must be "of an *interest of the debtor* in property." Similarly, Mich. Comp. Laws § 566.31(s) defines "transfer" to be a "direct or indirect" disposing of an "asset or an interest in an asset," and under Mich. Comp. Laws § 566.31(b), an "asset" is defined to mean "property of a debtor."

"In general, 'the law treats a corporation as an entirely separate entity from its stockholders, even where one person owns all the corporation's stock." *Lakeview Commons v. Empower Yourself, LLC*, 802 N.W.2d 712, 716 (Mich. Ct. App. 2010) (citation omitted). Zelazny was the sole shareholder of Zelazny PC, but the property of Zelazny PC was not the property of Zelazny, nor did Zelazny have an interest in that property within the meaning of

56

§ 544(b). Zelazny's property was the stock of Zelazny PC, which was not transferred to anyone. The Trustee has not pled or argued any valid basis for disregarding the corporate veil of Zelazny PC.

Nor has the Trustee pled or argued any other valid basis for avoiding or recovering the $20,000.00 underpayment Zelazny PC received for transferring its assets under the May 1, 2017 Sale Agreement. For example, Zelazny is not only the sole shareholder of Zelazny PC, but also claims to be a creditor, owed repayment of loans he made to Zelazny PC. As successor to the Debtor Zelazny's property interests, the Trustee succeeded to Zelazny's claim as a creditor of Zelazny PC. As such, the Trustee succeeded to any claim that the Debtor Zelazny may have had for repayment by Zelazny PC of the shareholder loans. And the Trustee succeeded to any possible claim Zelazny may have had as a creditor under the Michigan dissolution statute(s),[123] that Zelazny should have been paid on a pro rata basis, with other creditors of Zelazny PC, as to either the $30,000.00 the PC received, or as to the $20,000.00 that the PC should have received but did not, or both.

But the problems with such claims by the Trustee are first, they were not proven; and second, the Debtor Zelazny waived any such claims when he entered into the May 1, 2017 Sale Agreement, which provided only at most $30,000.00 to Zelazny PC, and after the closing of the Sale Agreement, when Zelazny caused Zelazny PC to pay all of its money to creditors other than himself.

Therefore, the Court will enter a judgment on Count I of the Complaint, that the Trustee avoid and recover only the $70,000.00 avoidable transfer of the Debtor's individual interest in

---

[123] *See, e.g.,* Mich. Comp. Laws Ann.§ 450.1855a.

57

the May 1, 2017 sale proceeds.

**G. The Trustee also is entitled to pre-judgment and post-judgment interest on the judgment amount of his fraudulent transfer claim.**

In the Complaint, the Trustee requests pre-judgment and post-judgment interest."[124]  For the following reasons, the Court will grant Plaintiff Trustee pre-judgment and post-judgment interest.

Section 1961 of Title 28 concerns post-judgment interest.  It states, in relevant part:

> (a) Interest shall be allowed on any money judgment in a civil case recovered in a district court. . . .  Such interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding. . . the date of the judgment. The Director of the Administrative Office of the United States Courts shall distribute notice of that rate and any changes in it to all Federal judges.
>
> (b) Interest shall be computed daily to the date of payment except as provided in section 2516(b) of this title and section 1304(b) of title 31, and shall be compounded annually.

28 U.S.C. § 1961 (period and footnote omitted).

Although 28 U.S.C. § 1961 only applies to the award of post-judgment interest, many courts have used the rate in 28 U.S.C. § 1961 in also awarding pre-judgment interest.

This Court is one such Court.  In *Glob. Technovations, Inc. v. Onkyo U.S.A. Corp. (In re Glob. Technovations, Inc.)*, 431 B.R. 739, 774–76 (Bankr. E.D. Mich. 2010), *aff'd*, No. 10-12781, 2011 WL 1297356 (E.D. Mich. Mar. 31, 2011), *aff'd sub nom. Onkyo Europe Elecs.*

---

[124]  *See, e.g.*, Compl. (Docket # 1) at 3 ¶ 38.

58

*v. Glob. Technovations, Inc.* (*In re Glob. Technovations Inc.*), 694 F.3d 705 (6th Cir. 2012), this Court applied the rate in 28 U.S.C. § 1961 in awarding pre-judgment interest.  In that case, this Court discussed, at length, the rules and principles courts should apply in deciding whether to award pre-judgment interest:

> It is well-settled that, unless prohibited by a statute, bankruptcy courts, as units of the district court under 28 U.S.C. § 151, have broad discretion in determining whether to award prejudgment interest based on the particular equities of a case. *See, e.g., Ford v. Uniroyal Pension Plan*, 154 F.3d 613, 616, 619 (6th Cir. 1998); *Bricklayers' Pension Trust Fund v. Taiariol*, 671 F.2d 988, 989–90 (6th Cir. 1982); *Smith v. Am. Int'l. Life Assur. Co. of New York*, 50 F.3d 956, 958 (11th Cir. 1995).

> Although 28 U.S.C. § 1961(a) applies only to postjudgment interest, this statute does not prohibit an award of prejudgment interest, and some federal courts have applied 28 U.S.C. § 1961(a) to determine the prejudgment interest rate, particularly where the Bankruptcy Code or other federal statutes supply the substantive right. *See, e.g., Sweet v. Consol. Aluminum Corp.*, 913 F.2d 268, 270–71 (6th Cir. 1990)(affirming the district court award of prejudgment interest under 28 U.S.C. § 1961(a) on a claim for pension benefits); *Lewis v. Harlin* (*In re Harlin*), 325 B.R. 184, 193 (Bankr. E.D. Mich. 2005)(stating that "[s]ome bankruptcy courts have exercised their equitable discretion to award prejudgment interest and set the prejudgment interest rate based on 28 U.S.C.A. § 1961(a)," and citing such cases); *Floyd v. Dunson, d/b/a MMD* (*In re Ramirez Rodriguez*), 209 B.R. 424, 434 (Bankr. S.D. Tex. 1997)(holding that the trustee, who had successfully recovered preferential and fraudulent transfers, was "entitled to recover . . . prejudgment interest at the statutory rate set forth in 28 U.S.C. § 1961(a)," and citing other cases awarding prejudgment interest at the statutory rate set forth in 28 U.S.C. § 1961(a)); *Wilson v. First Nat'l Bank, Lubbock, Texas* (*In re Missionary Baptist Found. of Am., Inc.*), 69 B.R. 536, 538–39 (Bankr. N.D. Tex. 1987)(finding it logical for the bankruptcy court to

apply the rate of interest in 28 U.S.C. § 1961 to both prejudgment and postjudgment interest where the Bankruptcy Code created the substantive right); *Waldschmidt, v. Ranier* (*In re Fulghum Constr. Corp.*), 78 B.R. 146, 153 (M.D. Tenn. 1987), *rev'd on other grounds*, 872 F.2d 739 (6th Cir.1989)(finding that the bankruptcy court did not abuse its discretion in applying the rate of interest in 28 U.S.C. § 1961 to a preference action by the bankruptcy trustee).

In determining whether prejudgment interest is appropriate, bankruptcy courts should inquire whether such an award would serve to compensate the prevailing party and is equitable under the circumstances. *See Frymire v. Ampex Corp.*, 61 F.3d 757, 774 (10th Cir. 1995); *Floyd v. Dunson, d/b/a MMD* (*In re Ramirez Rodriguez*), 209 B.R. 424, 434 (Bankr. S.D. Tex. 1997). A prejudgment interest award is appropriate where it is necessary to fully compensate a party for the lost use of its money and to prevent the defendant's unjust enrichment. *See Sweet v. Consolidated Aluminum Corp.*, 913 F.2d 268, 270–71 (6th Cir.1990); *Vic Bernacchi & Sons, Inc. v. Loxas* (*In re Vic Bernacchi & Sons, Inc.*), 170 B.R. 647, 656 (Bankr. N.D. Ind. 1994); *Fulghum Constr. Corp.*, 78 B.R. at 154. *In Van Dyck/Columbia Printing v. Katz*, the court stated that

> "[T]he factors influencing the exercise of [the court's] discretion to [award prejudgment interest] include: (1) the need for full compensation of an injured party; (2) considerations of fairness and the relative equities of the award; (3) the remedial purpose of the statute involved, and/or (4) such other general principles as are deemed relevant by the court."

289 B.R. 304, 318 (D.Conn.2003)(quoting *United States v. Nat'l Westminster Bank USA* (*In re Q–C Circuits Corp.*), 231 B.R. 506, 513–14 (E.D.N.Y. 1999)(citing *Wickham Contracting v. Local Union No. 3, IBEW*, 955 F.2d 831, 833 (2d Cir.1992))).

Federal courts have exercised broad discretion in determining the time from which prejudgment interest

should accrue. "With respect to fraudulent transfers, some courts have awarded prejudgment interest beginning from the time that demand or an adversary proceeding is initiated, while others have awarded prejudgment interest from the date of the transfer." *LaSalle Nat'l Bank Ass'n v. Paloian*, 406 B.R. 299, 363 (N.D. Ill. 2009) (citation omitted). However, generally, courts award prejudgment interest from the date a demand is made for the return of property or where no demand was made, from the date an adversary complaint was filed. *Dayton Title Agency, Inc. v. White Family Cos., Inc.* (*In re Dayton Title Agency, Inc.*), 292 B.R. 857, 876 (Bankr.S.D.Ohio 2003) (citation omitted); *Floyd v. Dunson, d/b/a MMD* (*In re Ramirez Rodriguez*), 209 B.R. 424, 434 (Bankr. S.D. Tex. 1997); *Pereira v. Goldberger* (*In re Stephen Douglas, Ltd.*), 174 B.R. 16, 22 (Bankr. E.D.N.Y. 1994); *Waldschmidt, v. Ranier* (*In re Fulghum Constr. Corp.*), 78 B.R. 146, 153–54 (M.D. Tenn. 1987), *rev'd on other grounds*, 872 F.2d 739 (6th Cir.1989).

431 B.R. at 774-76.

Applying the concepts discussed in *Global Technovations*, the Court finds that pre-judgment interest is necessary in this case: (1) to compensate the Debtor Zelazny's bankruptcy estate for the lost use of the $70,000.00 that the Debtor Zelazny transferred to and for the benefit of the Defendants under the May 1, 2017 Sale Agreement; and (2) to prevent (or at least minimize) the Defendants' unjust enrichment from having received the $70,000.00. The Court further finds that fairness, equity, and the remedial purposes of Bankruptcy Code §§ 544 and 550 all support an award of pre-judgment interest. The Court will award pre-judgment interest from the date of the avoided transfer — May 1, 2017 — to the date of entry of judgment, at the federal statutory rate under 28 U.S.C. § 1961 that was in effect on May 1, 2017, which was 1.06% per

61

annum, compounded annually.[125]  The Court calculates that the total amount of such pre-judgment interest is $5,338.30.

For these same reasons, the Court will also allow post-judgment interest at the federal statutory rate in effect as of the date of entry of judgment.  28 U.S.C. § 1961(a).  That rate is 5.12% per annum, compounded annually.[126]

## H.  Count III: § 502(d)

In Court III of the Trustee's Complaint, the Trustee seeks an order disallowing any claim the Defendants file in the Debtor Zelazny's bankruptcy case, under 11 U.S.C. § 502(d).  That

---

[125]  Federal interest rates for civil judgments can be found at https://jnet.ao.dcn/financial-management/accounting/post-judgment-interest-rates.  In order to find the interest rate for a judgment entered on May 1, 2017, it is necessary to input "April 2017" in the "HISTORICAL RATE INFORMATION" search bar. The interest rate applicable under 28 U.S.C. § 1961 to a judgment entered on May 1, 2017 is the interest rate for preceding calendar week – the week ending on April 28, 2017, which was "1.06%."  Below is a copy of information from this website:

HISTORICAL RATE INFORMATION
To search, type month and year (Example: May 2018)  April 2017

| Week ending | For civil judgments entered | Rate |
| --- | --- | --- |
| April 28, 2017 | May 1 - 7, 2017 | 1.06% |
| April 21, 2017 | April 24 - 30, 2017 | 1.02% |
| April 14, 2017 | April 17 - 23, 2017 | 1.05% |
| April 7, 2017 | April 10 - 16, 2017 | 1.04% |

[126]  Federal interest rates for civil judgments can be found at https://jnet.ao.dcn/financial-management/accounting/post-judgment-interest-rates.  The interest rate applicable under 28 U.S.C. § 1961 to a judgment entered on April 19, 2024 is the interest rate for preceding calendar week — the week ending on April 12, 2024 — which was "5.12%."  Below is a copy of information from this website:

POST JUDGMENT INTEREST RATES

CURRENT RATE

The current rate for the week ending **April 12, 2024** is **5.12%** for civil judgments entered **April 15 - 21, 2024**.

section states, in relevant part:

> (d) Notwithstanding subsections (a) and (b) of this section, the court shall disallow any claim of any entity from which property is recoverable under section . . . 550 . . . of this title or that is a transferee of a transfer avoidable under section . . . 544 . . . of this title, unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under section . . . 550 . . . of this title.

11 U.S.C.A. § 502(d).

To date neither of the Defendants has filed a proof of claim, and the deadline to do so was June 22, 2021.[127] But because the Court has concluded that each of the Defendants is an entity from which property is recoverable under § 550(a), and is a transferee of a transfer avoidable under 11 U.S.C. § 544, the Court will include in its judgment against each of the Defendants that, in the event any claim is filed by either of the Defendants, such claim is disallowed under 11 U.S.C. § 502(d), unless and until the full amount of the judgment on Count I is paid.

**VII. Conclusion**

Based on the findings of fact, conclusions of law, and the reasons stated in this Opinion, the Court will enter judgment, by a separate document, as follows:

(1) on Count I of the Trustee's Complaint, judgment in favor of the Trustee and against the Defendants,

(a) avoiding the $70,000.00 transfer to Defendant Dentalkeeping, described in Part VI.F of this Opinion;

(b) granting judgment in favor of the Trustee and against both of the Defendants, jointly and severally, in the following amounts:

- $70,000.00, plus

---

[127] *See* Docket # 21 in Case No. 20-50976.

- pre-judgment interest from May 1, 2017 to the date of entry of the judgment, at the federal statutory rate under 28 U.S.C. § 1961 of 1.06% per annum that was in effect on May 1, 2017, compounded annually, which the Court calculates to be $5,338.30, plus

- post-judgment interest at the federal statutory rate in effect as of the date of entry of the judgment under 28 U.S.C. § 1961(a), which is 5.12% per annum, compounded annually, plus

- costs;

(2) granting judgment in favor of each of the Defendants on Count II of the Trustee's Complaint, and dismissing that Count with prejudice; and

(3) granting judgment in favor of the Trustee and against each of the Defendants on Count III of the Trustee's Complaint, disallowing any claims filed or to be filed, by either of the Defendants in the Debtor Donald Zalenski's bankruptcy case, under 11 U.S.C. § 502(d), unless and until the full amount of the judgment on Count I is paid.

**Signed on April 19, 2024**



/s/ Thomas J. Tucker
**Thomas J. Tucker**
**United States Bankruptcy Judge**